Submitted on record and briefs November 5, 2002, reversed February 19, 2003

In the Matter of Terri Sue Webb,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

TERRI SUE WEBB,
*Appellant.*

30-02-02421; A117575

63 P3d 1258

James A. Palmer filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Devorah Signer Hill, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Appellant challenges an order of involuntary civil commitment, arguing that the record is insufficient to support a finding by clear and convincing evidence that she suffers from a mental disorder that renders her a danger to herself or unable to provide for her basic needs. The state concedes that the evidence in the record is insufficient. For the following reasons, we accept the state's concession and reverse.

The relevant facts are undisputed. At the time of her commitment hearing, appellant was a 27-year-old college graduate who described herself as an anarchist and an activist in the "Stop Segregation" nudist movement. She professed to support a "truly clothing-optional world where the issue of clothing would be one of choice wherever and whenever." She was found in Eugene riding her bicycle naked in near-freezing weather.

She was admitted to a psychiatric hospital with a diagnosis of a "bipolar, manic episode." Upon admission to the hospital, she had a slightly lower than normal temperature, but otherwise was adequately nourished and not dehydrated. She insisted on remaining unclothed and attempted to assault a nurse who tried to clothe her.

When asked about the behavior that led to her hospitalization, appellant explained that she wanted to educate people about legalizing public nudity. Asked about riding around in the cold, she replied that the cold did not bother her and that it actually gave her "spiritual feelings of freedom." She expressed no fear of assault because she could take care of herself.

Appellant has an apartment, but confesses that she is unemployed and is no longer able to pay rent. She plans either to borrow money or to stay with friends. In the meantime, she has applied for General Assistance and Supplemental Social Security Income. She has been arrested on a number of occasions, primarily related to her public nudity. In the past, she has been diagnosed with bipolar disorder and has been committed on one previous occasion.

At the hearing, Annegret Hoffmann, a nurse at the hospital, testified concerning appellant's history and condition. She expressed concern that appellant has limited insight, is unwilling to take medications, and has impaired judgment. She said that appellant's exposing herself to the cold for long periods of time could be harmful. She testified, however, that she did not know how long it would take for appellant to put herself at risk and that she had no idea whether appellant actually had ever been outside long enough to put herself at risk. She further testified that she presumed that appellant's public nudity was a consequence of a mental disorder because appellant's explanations concerning the political and spiritual bases for her actions were clearly delusional.

Dr. Paul Helms, the medical director of the psychiatric hospital, also testified. When questioned whether he believed appellant to be a danger to herself, Helms testified that he "struggled" with that matter. He said that he had worked with her before and that, while he initially was concerned about her safety, the fact remained that "she has done this on numerous occasions and has not been harmed to any extent that I can determine medically." He said that he remains concerned in that she appears to perceive temperatures to be warmer than they actually are. Helms acknowledged that he did not know how long appellant exposed herself to cold temperatures and that he therefore did not know whether she actually was engaging in activity that put her at risk from the temperature.

Helms said that a bigger concern to him, "albeit somewhat paternalistically, is her putting herself in I think some very real danger of being naked in the presence of the wrong type of individual and being assaulted." He said that he had spoken to appellant about that concern, but that

> "[s]he tells me that she can protect herself. I guess, based on history thus far, that's true. But I wouldn't want to trust that in the future. But I also recognize that this is somewhat beyond the usual evidence of dangerousness.
>
> "It's a potential danger. I can't say it's an imminent danger."

Helms testified that, although appellant was doing a "poor job" of taking care of herself overall, she appears to be obtaining sufficient food, has never been malnourished, has never been dehydrated, and appears to be meeting her basic needs. He nevertheless concluded that she should be involuntarily committed, principally because of his concern about the possibility that she could be assaulted if she continued to be publicly naked in the wrong sort of neighborhood.

A former roommate also testified. He said that he often had witnessed appellant go out of doors to ride her bike naked in the cold, but that she always came back "fairly quickly" and never returned shivering or in any way impaired by the temperature.

Appellant also testified. She explained that

"I began shedding my clothes in public a few years ago. This was not due to any mental illness but simply because I recognized their lack of functionality under the circumstances and recognized my own freedom to remove the clothing. Yes, I have had encounters with law enforcement [and] such but this has always been due to my [conscious] choice.

"* * * * *

"Some may shudder to see me less than fully dressed in less than ideal conditions, for instance, in rain and cooler temperatures but I would challenge anybody with such objections to try it themselves. In my experience, cooler temperatures can be quite comfortable or even [exhilarating] and not even an issue when one is engaged in exercise. It's not as if I've always been alone in cooler conditions. For instance, here is a picture of me and a fellow member of Stop Segregation in Seattle taking a walk in Portland on a rainy quite chilly day.

"Certainly I am always conscious of potential dangers be they of the temperature or from admirers. But at this point I have so much experience behind me, I am completely confident in my ability to care for myself and know there is no necessary intervention from the State in this case."

The examiner, Debra Lawrence, then reported that, although this is a difficult and complicated case, she was of

the opinion that appellant was dangerous to herself. According to Lawrence, "it may only be a matter of time until something quite bad might happen to her."

The trial court concluded that appellant is unable to meet her basic needs and is a danger to herself because of her propensity to ride about naked in the cold. The court explained that it was not persuaded that she was dangerous because she rode about in unsavory neighborhoods naked but that it was concerned that exposing herself to the cold was a "personally dangerous activity."

■ On appeal, appellant argues that there simply is not clear and convincing evidence that she cannot meet her basic needs or that she is a danger to herself. As we have noted, the state agrees.

■■ So do we. Although the law does not require that a threat of harm be immediate, it does require that the threat be real and exist in the near future. *State v. Nguyen*, 180 Or App 541, 545, 43 P3d 1218 (2002). The law also requires that the threat be established by clear and convincing evidence, that is, evidence of "extraordinary persuasiveness." *State v. Siebold*, 100 Or App 365, 366, 786 P2d 219 (1990) (internal quotation marks omitted).

The evidence in this case does not meet those legal standards. There certainly is a possibility of harm in riding around nude in the cold. But, at least on this record, no more has been shown than that mere possibility. Both Hoffman and Helms testified that they did not know how long appellant rode naked in the cold and that they had no idea whether appellant ever had exposed herself long enough to present a health risk. The only evidence on that point came from appellant's former roommate, who testified that appellant's bicycle rides always were brief and that she never came back shivering or otherwise showing any effects of exposure.

Indeed, both Helms and Lawrence based their recommendations not on appellant's exposure to the cold but on the potential danger of assault. The problem is that, on this record, there is at best only a possibility of such harm. The fact is that appellant has been engaging in the same behavior repeatedly and apparently has never been assaulted.

As Helms noted, based on appellant's history, she does appear to be able to take care of herself. According to Helms, while acknowledging that his concerns went "somewhat beyond the usual evidence of dangerousness," he worried about the risk that some day she will not be able to take care of herself. He conceded that there is only "a potential danger" and that he could not say that she was placing herself in imminent harm. Lawrence similarly expressed concern that "something quite bad might happen to her." Neither, however, could offer more than the vague unease about the possibility of harm.

Such apprehensions are insufficient to establish the need for commitment. *See, e.g., State v. Roberts*, 183 Or App 520, 524-25, 52 P3d 1123 (2002) (although the appellant evidently wandered in the streets, the record was insufficient to support commitment because it "contains no indication that this actually has ever led to injury"); *State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999) ("Apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment."). Appellant and the state therefore are correct that the trial court erred in concluding that the record contains clear and convincing evidence that appellant cannot provide for her basic needs and that she is a danger to herself.

Reversed.