Argued and submitted October 3, reversed November 16, 2005

In the Matter of Janie Willison Hambleton,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

JANIE WILLISON HAMBLETON,
*Appellant.*

30-05-03007; A127686

123 P3d 370

James J. Kolstoe argued the cause and filed the brief for appellant.

Paul L. Smith, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

HASELTON, P. J.

---

* Rosenblum, J., *vice* Richardson, S. J.

## HASELTON, P. J.

Appellant seeks reversal of an order adjudicating her to be a mentally ill person and committing her to the Mental Health Division. ORS 426.130(1)(b)(C). She asserts that the state failed to prove, by clear and convincing evidence, that, because of a mental disorder, she was a danger to herself or was unable to provide for her basic needs. ORS 426.005(1)(d).[1] On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we reverse.

Appellant is a 47-year-old woman, who has been diagnosed with "a psychotic disorder, [the] etiology of which is unclear." The events that triggered these commitment proceedings occurred on February 3, 2005. As of that date, appellant had been living, homeless, in Eugene for at least six months. She had sought assistance from Catholic Community Services and had established a regular, ongoing relationship with that agency. Appellant had also established a relationship with a homeless friend with whom she would sometimes share a hotel room.

At about 9:00 p.m. on February 3, the desk clerk of a hotel in Eugene was talking with a guest when a man came in and told them that there was a woman (appellant) sitting in the cab of the guest's pickup. The clerk and the guest went outside to investigate, and they found appellant sitting in the truck; she was "sopping wet."[2] The temperature outside was

---

[1] ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A)  Dangerous to self or others.

"(B)  Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

[2] It is unclear from the nonhearsay portions of the record whether appellant was at least partially clothed while sitting in the truck. Although respondent's brief states that appellant was naked, the guest who owned the truck did not testify at the commitment hearing, and the desk clerk, who did testify, never stated that appellant was naked. The police report for the incident states that the investigating officer spoke with emergency personnel who had been summoned to the hotel and that they had told him that the guest had "found a female sitting in his [vehicle] naked, and wet from head to toe." However, that statement attributed to the guest was hearsay, which the trial court correctly excluded.

approximately 40 degrees. There is no evidence that appellant was shivering or showing any adverse effects from her exposure to the cold while being wet.

The guest spoke to appellant, and the desk clerk returned to the hotel. Thereafter, the guest and appellant came into the lobby; at that time, appellant was wearing a long flannel shirt with no other clothing.[3] The desk clerk offered appellant a hot drink, and "she just smiled at [him]," saying nothing. When emergency personnel later came to the hotel, appellant "talk[ed] to them a little bit."

Eugene Police Officer Ben Hall was also dispatched to the hotel. When he arrived, appellant was wearing a hotel bedsheet in addition to the flannel shirt, without any other clothes or footwear. Although appellant was "very guarded" in her responses, Hall was able to ascertain that appellant had come to a body of water "the canal"—near Alton Baker Park and had swum naked across the canal. Appellant was unable, or unwilling, to explain to Hall why she had engaged in that conduct: When he asked her why "she had shown up naked in a stranger's car soaked from head to toe," appellant responded, "Show me the money." Appellant refused to identify herself, did not know where her clothing was, and could not tell Hall where she lived.

Appellant did tell Hall that she wanted to leave and that she did not want to go to the hospital. However, appellant could not tell Hall "where she wanted to go or how she was going to get there[.]" Ultimately, Hall determined that "it was clear [appellant] was not capable of taking care of herself." He took appellant into custody and took her to Sacred Heart Hospital in Eugene.

At the hospital, appellant identified herself using an alias. She continued to be "very guarded" and was "very distrustful" and generally uncooperative. Appellant would answer questions with questions and was "essentially argumentative," asserting that "[you] have a right to swim in the

---

[3] The nonhearsay portions of the record are also unclear regarding when or how appellant obtained the flannel shirt. The desk clerk gave no testimony on that subject. The police report includes a statement that the guest who owned the truck "gave [appellant] a jacket[,]" but, again, that statement was correctly excluded as hearsay. *See* 202 Or App at 528 n 2.

canal naked if you want" and that she was being held in violation of her rights. Over time, appellant variously admitted and denied having been in the water and made a reference that "maybe she was in the Polar Bear Club." At different times, appellant "implied that she was somehow drawn to" the water, that "it was just something within," and that she "had to get to the music * * * wanted to go to the music." When interviewed by the examiner, appellant "smile[d] as she talk[ed] about the swim," and "it seem[ed] to have special meaning for her," but, when asked to explain her behavior, she responded simply, "I have my own reasons."

At the commitment hearing, the state presented the testimony of Officer Hall, the hotel desk clerk, a board-certified psychiatrist who treated appellant at Sacred Heart Hospital, and the precommitment investigator. None of those witnesses testified regarding any harm that appellant had suffered as a result of her conduct or could suffer if she repeated that conduct. However, the treating psychiatrist rendered the unelaborated opinion that appellant was a danger to herself and was unable to provide for her basic needs. The examiner concurred in that opinion, concluding that appellant's

> "judgment and insight are impaired to such an extent that it is difficult to imagine she would not place herself in harm's way in the world. She is homeless and indigent. It does not appear she has any acquaintances in this area."

Appellant presented the testimony of her friend with whom she had sometimes shared lodging. He described her as "the most caring person I have ever met in my life." In addition, appellant's caseworker with Catholic Community Services testified that she had seen appellant approximately once a week over the preceding six months and that, in her estimation, the swimming episode was an "isolated incident" in which appellant had used "poor judgment." The caseworker, who did not believe that appellant was a danger to herself, also stated that, if appellant were released, she would make sure that "[appellant] and her possessions get somewhere safe."[4]

---

[4] The caseworker testified that appellant's personal property had been found near the canal and had been brought to the caseworker's office.

Finally, at the court's invitation, appellant offered a statement describing her own perspective on her conduct and the proceedings:

> "[W]hat I chose to do was my own choice for my own reasons. And just because I don't tell anybody doesn't make me subject to forced therapy or forced medical help when I refused it.

> "I chose not to have anything to do with this hospital. I didn't need its help. And I haven't needed its help the entire time that I'm here. And things have been done against my will which—my will goes over anybody else's outside of me because I'm not a harm to myself or to anybody else. I do help a lot of people in this town.

> "* * * * *

> "But when it came time to checking out of, you know, refusing service from the hospital, they wouldn't allow that. They wouldn't let me alone and let me walk out. And all I needed at the most was clothes so that people would be better about seeing me a clothed houseless person that night if that was what I was, as opposed to an unclothed or partially clothed.

> "* * * * *

> "Anyway, this is just my own personal life in which I chose to do something that, whether it was right or wrong, whether—there wasn't any law against it, it's just whether or not it was something one would do or not. It's a decision that I made and I survived and I didn't cause myself any harm. So I don't really understand why all this amount of money and time is being wasted."

The court then asked appellant, "Why were you in the water naked?" She responded:

> "Did anybody see me in the water? Nobody here has seen me in the water. But I do admit that I went through the water by myself but that's my own choice. You know, it's really nobody else's business but my own."

Appellant's counsel asked if she had intended to harm herself, and appellant responded, "No. No, I didn't. I'm a great swimmer. I just proved something to myself that I actually am pretty impressed with myself."

Appellant then concluded:

"I've been surviving every single day in this town on the street without the help of any government agency official. And I am with people that, you know, are out there that drink, that do drugs, and harm other people and they haven't harmed me. And when I'm around, usually people are behaving a lot better because I show them compassion and caring. And I have also done a lot of volunteering over at the Family Diner to help feed these people.

"Whether or not you guys understand, what I did is really none of anybody else's business really, you know. Nobody saw me do anything. I didn't take my clothes off to go swim. I swam with some clothes that I had on. They got wet and I took them off to dry. I was doing what I thought to take care of myself.

"* * * * *

"* * * So [the] bottom line is it's my life. I chose to do something. I won't be doing it again, I can tell you. But I lived through something that I'm pretty impressed with. And maybe I would understand now the Polar Bear Club people very well.

"But I'm going to go about my business of taking care of myself as I have. I'm 47 years old and I've never been in trouble nor have I had, you know, anything that caused a harm to myself or to others."

The trial court determined that, due to a mental disorder, appellant was dangerous to herself and was unable to meet her basic needs. Accordingly, the trial court committed appellant pursuant to ORS 426.130(1)(b)(C).

On appeal, appellant does not challenge the trial court's determination that she has a mental disorder. Conversely, the state concedes that the record does not support the trial court's determination that appellant is unable to provide for her basic needs. We accept that concession as well-founded. Accordingly, our inquiry reduces to whether the evidence establishes that appellant is dangerous to herself.

In that regard, appellant emphasizes that there is no evidence in this record showing that she suffered any harm from the swimming episode or would be likely to suffer any

harm if—contrary to her assurance that "I won't be doing it again, I can tell you"—she engaged in such conduct in the future. In particular, appellant stresses that there is no evidence as to how long she was in the canal; there is no evidence that she was shivering afterwards or exhibited any adverse effects from her swim; and, notwithstanding implicit concerns about possible hypothermia, there is no expert medical testimony substantiating such concerns in the circumstances presented here.[5] Appellant also points out that the record discloses no history of similar behavior and that the caseworker, who had an established relationship with appellant, deemed this episode to be an aberrant "isolated incident." Ultimately, appellant contends that this case is closely analogous to—and, indeed, materially indistinguishable from—*State v. Webb*, 186 Or App 404, 63 P3d 1258 (2003), which we address below.

The state responds that dangerousness to self is manifest in that appellant, in response to delusions (being "drawn to" the water), swam nude in near-freezing temperatures and subsequently refused offers of help. Thus, the state contends, this is a classic "harm's way" case:

> "Here, [appellant's] poor decision making skills—which were caused by her mental disorder—made it highly probable that she would harm herself in the near future. Although she was not harmed or injured after swimming in the canal on *this* occasion, her inability to recognize potential harm and her consistent refusals to accept assistance means that it is only a matter of time before she does harm herself, making the threat of harm both real and imminent."

(Emphasis in original.) Finally, the state asserts that this case is substantively different from *Webb* in respects that we address presently.

We begin, as we frequently do in civil commitment cases, by reiterating the rigors of the state's burden of persuasion. The standard of proof is "clear and convincing" evidence. ORS 426.130(1)(b). To be "clear and convincing" evidence must be of "extraordinary persuasiveness." *State v.*

---

[5] Nor is there any evidence of the temperature of the water in the canal.

*Howell*, 53 Or App 611, 617, 633 P2d 14 (1981); *see also State v. Jayne*, 174 Or App 74, 77-78, 23 P3d 990, *rev den*, 332 Or 316 (2001) (describing "clear and convincing evidence" as evidence establishing that "the truth of the facts asserted is highly probable"). Those standards are not merely abstract or precatory. Rather, they are the product of a fundamental recognition of "the priority of preserving personal liberties in [civil commitment] cases." *State v. Lott*, 202 Or App 329, 354, 122 P3d 97 (2005) (Edmonds, P. J., dissenting); *see also id.* ("The tension between the protection of personal liberties and the provision of medical help to persons with mental disorders can be relieved only if courts strictly adhere to the statutory requirements for involuntary commitment and ensure that there is an evidentiary basis that satisfies each of those requirements.").

■■ We turn, then, to the substantive requisites of commitment based on the "dangerous to self" criterion. To establish that appellant is dangerous to herself, the state must show that appellant's mental disorder has "resulted in harm to [her]self * * * or created situations likely to result in harm." *State v. Christofferson*, 47 Or App 1087, 1090, 615 P2d 1152 (1980); *see also State v. Sea*, 137 Or App 333, 338, 904 P2d 182 (1995). Although "the danger to self standard does not require a threat of immediate harm[,]" "consistent with the basic needs standard, the threat must exist in the near future." *State v. Jacobson*, 142 Or App 371, 377, 922 P2d 670 (1996).

Here, the record establishes that, on one occasion and for an unknown length of time, appellant swam with few, or no, clothes in 40-degree weather. Appellant's reasons for engaging in that conduct are unclear, but it appears likely that she acted in response to some delusion related to her mental disorder. There is no evidence that appellant had ever before engaged in such conduct; there is no evidence that she was harmed as a result of the swimming episode; and there is no evidence that she would be likely to suffer any harm, specifically including hypothermia, if she were to engage in such conduct in the future. Thus, on this record, concerns about potential harm to appellant, while understandable, are conjectural and speculative. *See State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999) ("Apprehensions, speculations and

conjecture are not sufficient to prove a need for mental commitment.").

This case is, in fact, materially indistinguishable from *Webb*. There, the appellant, a young woman who was diagnosed with a bipolar disorder, was hospitalized after riding her bicycle naked in near-freezing weather. 186 Or App at 406. The appellant, who had a history of engaging in such conduct, explained that she supported a "truly clothing-optional world" and that she sought to "educate people about legalizing public nudity." *Id.* Although there was no evidence that the appellant had actually suffered harm from her periodic peregrinations, a nurse testified at the commitment hearing that the appellant's "exposing herself to the cold for long periods of time could be harmful." *Id.* at 407. However, the nurse "did not know how long it would take for [the] appellant to put herself at risk" and "had no idea whether [the] appellant actually had ever been outside long enough to put herself at risk." *Id.* The examiner rendered the opinion that the appellant was dangerous to herself because "it may only be a matter of time until something quite bad [*viz.*, a sexual assault] might happen to her." *Id.* at 409. Ultimately, the trial court determined that, because the appellant's practice of "exposing herself to the cold was a 'personally dangerous activity[,]' " she was dangerous to herself. *Id.*

We reversed. We noted first that, with respect to potential harm from "riding around nude in the cold," "at least on this record, no more has been shown than [a] mere possibility" of harm. *Id.* at 409. In that regard, we observed that the appellant's former roommate had testified that "[the] appellant's bicycle rides always were brief" and "she never came back shivering or otherwise showing any effects of exposure." *Id.* We further determined that the evidence with respect to the potential danger from sexual assault was impermissibly speculative. In particular, although two witnesses expressed concerns about such a potential danger, the appellant had never been assaulted and those witnesses were unable to "offer more than the vague unease about the possibility of harm." *Id.* at 410. We thus concluded that "[s]uch apprehensions are insufficient to establish the need for commitment." *Id.*

The state acknowledges that *Webb* may be "[s]uperficially" similar to this case but proffers two purported distinctions. Neither is availing. First, the state asserts that, unlike the present appellant, the appellant in *Webb* "articulate[d] a rational reason" for her conduct—*viz.,* that her nude bicycle riding was an expression of her advocacy for a "truly clothing-optional world." However, our analysis in *Webb* did not address the purported "rationality" of the appellant's conduct there; rather, our analysis and disposition turned solely on the state's failure of proof of actual or likely future harm. 186 Or App at 409-10.

Second, the state asserts that in *Webb*, unlike in this case, there was no suggestion that the appellant had refused or resisted offers of assistance. That is true; *Webb* simply does not speak to that point. But, respectfully, in the circumstances here, where the state failed to establish the requisite likelihood of future harm, that is a distinction without a meaningful difference. Indeed, in contrast to the present appellant, who disavowed any intent to repeat the allegedly dangerous conduct, the appellant in *Webb* expressed her determination to continue her conduct. *Webb*, 186 Or App at 408.

In sum, here, as in *Webb*, "[t]he problem is that, on this record, there is at best only a possibility of [future] harm." 186 Or App at 409. *See also State v. Hayes*, 202 Or App 63, 71, 121 P3d 17 (2005) (where the appellant had, in response to auditory hallucinations, engaged in unspecified sexual conduct but there was no evidence of actual or potential harm from such conduct, "concern about potential future dangers to [the] appellant from acting in response to her auditory hallucinations is too attenuated and speculative to satisfy the 'clear and convincing' standard"); *State v. Roberts*, 183 Or App 520, 525, 52 P3d 1123 (2002) (although the appellant evidently wandered in the streets, the record was insufficient to support commitment because it "contains no indication that this activity has ever led to injury"). Accordingly, the trial court erred in determining that appellant is dangerous to herself.

Reversed.