Argued and submitted February 21, reversed October 4, 2006

In the Matter of Despina Puha,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

DESPINA PUHA,
*Appellant.*

0408-68488; A125915

144 P3d 1044

Liza Jane Langford argued the cause and filed the brief for appellant.

Seann C. Colgan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

Appellant appeals from an involuntary commitment order. She asserts that the state failed to prove by clear and convincing evidence that she had a mental disorder that caused her to be a danger to herself or to be unable to provide for her basic needs. On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we reverse.

Appellant was almost four months pregnant at the time of her commitment hearing on August 6, 2004. She has a history of mental health issues but lives independently in an apartment. Her adult daughter and her mother live nearby and help her care for herself. Of her previous mental health history, the record shows no more than the dates for one prior involuntary commitment, from October 12 to December 30, 1998. The nonhearsay record in this case is unusually spare, even lacking an explanation of how her current hospitalization occurred. Appellant was placed on a hospital hold after a psychiatric examination on August 2, 2004. At her hearing, she admitted that she had recently made a threat of self-harm, to cut off her legs if she had a whisky bottle.

The precommitment investigator concluded that appellant's diagnosis was bipolar disorder, currently manic, and recorded the following observations of appellant on August 4:

"* * * [She] states that she remembers me from October 1998 at OHSU, when I did her investigation and sent her to a court commitment hearing. She said, 'I want you to be the judge and let me go right now. I don't have to go to court.' 'I'm pregnant now; I'm going to have my baby,' she stated. I asked her if she wanted this baby and she replied that she did. She told me that her husband wants this baby. She told me that she wouldn't take medication because she is pregnant. I told her that I understand that her doctor told her he wanted her to stop Depakote for the first trimester. 'No,' she said, 'I don't take medication. I'm not ever going to take medication. I can see now. Before I couldn't see. I see many colors. I see you. You are the judge. Let me out of here.'

"[She] is very clear that she remembers being court committed, but denies that she has a need for medications. She is also clear that she is pregnant.

"* * * She immediately recognized me, even though she had not seen me for several years. * * * She was not cooperative with the interview and paced around the table, refusing to sit. She repeatedly spit on the floor and became angry when I asked her why she was spitting. Mood was irritable, affect was intense, and all comments were focused around getting out of the hospital immediately. She made repeated demands to be released. Insight and judgment were impaired and she clearly does not want to take medications. She spoke about her husband wanting the baby[.] * * * She told me that she lived with him[, the husband]. She escalated when I told her I would not release her and escalated even further when I told her we would go to court and talk with the judge. As I left the room, she was screaming and began pounding on the door when I closed the door, continuing to scream."[1]

At the hearing, appellant exhibited some unusual behaviors that made it difficult to conduct the proceedings. She paced, would not sit down, and occasionally interrupted the judge with tangential statements, such as noting that the time was ten o'clock and that she was hungry. Appellant covered her mouth with her hands, saying that she had to avoid smelling perfumes that emanated from her mother, who sat in the courtroom. The court recording system did not capture some of her responses to questions, perhaps because of her covered mouth and pacing.[2]

---

[1] We omit hearsay parts of the record, such as the statement in the precommitment investigator's report that appellant referred to a husband, "even though she does not have a husband and lives alone." Neither appellant nor any other witness testified about whether she had a husband. *See State v. Hambleton*, 202 Or App 526, 528 n 2, 123 P3d 370 (2005) (excluded as hearsay whether the appellant was found sitting in a truck naked because no one testified to that observation at the hearing).

[2] Appellant is a naturalized citizen who seems to speak English fluently but may speak with an accent. We note that some combination of these circumstances affected what was captured in the hearing transcript, because our *de novo* review is limited to the record before us. Some of the court examiners' remarks were not captured either, as we note below.

Appellant also had some difficulty orienting to her circumstances at the hearing. Responding to the first examiner, Mohler, she said that she did not know why she was in the courtroom. To his direct question whether she knew why she was before the judge, she answered with the phrase, "[d]own on Market Street somewhere." In quick succession, she said she did not know why she was in the hospital but then said she was there "because I'm crazy." She said she had been hospitalized for 48 days, when the hearing occurred four days after she entered the medical center. But appellant then accurately told the examiner that she was at home the week before the hearing and she told the judge that she had been hospitalized for five days. She knew she had taken medication in the past—in her words, was "forced to take medication"—but said that it was for sleeping and she had taken such medicine "[s]ince I was three years old." When asked if she had a history of "manic depression," she said she had been depressed, but connected it to a time when her "leg was broke when I was eight, three years or four."

Despite those signs of confusion, appellant accurately recited many facts about her circumstances at the time of the hearing. She knew the date, the time of day, and that she was almost four months pregnant, with a due date in mid-January. She gave her apartment address, reported an amount of cash that she had on hand to pay for a taxi to take her home, and told the court that she could borrow more money if needed and pay it back quickly. She said that she had a car, although she was not sure whether it was at her house or her aunt's. She said that she lived near a Safeway where she bought her food. When asked if she had thought about cutting off her legs with a whisky bottle, she answered "Mm-hm," a phrase that we are able to infer meant "yes" throughout her testimony. But she also elaborated that she had "never tr[ied] that" and was not thinking about it currently because she has her house and needs to cook. In response to direct questions about whether she would harm herself, appellant said that she had "tr[ied] to kill myself but I couldn't do it," and that such incidents had happened in "1998, and maybe sometime before," "when I was younger."

When Mohler asked why she was refusing to take her medication, appellant replied, "Because it's not good.

\* \* \* you can be choked or whatever, you know." Appellant answered affirmatively to his follow-up question, "You think the medicine's choking you?" When precommitment investigator, O'Malia, asked her whether doctors had told her to "stay on your medication," appellant replied,

> "No. Because I don't have any medication. I stop taking long time, years. And I tried again and I—I—no. They make you go having sex on streets, you know, even on your car, on the top of the buildings somewhere."

At another point, appellant testified, "No, I don't need any medication, no. Because you can see I don't need them. I don't need any medication around here." She also said that she had recently refused to provide a blood sample because "[e]verywhere, [are] stores, they can buy wine \* \* \* [a]nd beets, red beets, and they can make a lot of blood if they need." She admitted that she had screamed at the nurses and she offered the opinion that nurses "stink." However, we infer from appellant's testimony that she had allowed other blood draws during her precommitment hospitalization and had only refused the most recent request.

Although she admitted that she was refusing medication for her psychiatric care, appellant gave uncontradicted testimony that she had not refused prenatal care. In answer to one examiner's statement that there was "some concern that you haven't been following through with the prenatal care," appellant said that she had gone to two prenatal appointments and had given sonogram pictures of her baby to her mother and brother. However, the extent of her scheduled prenatal appointments is not in the record.

Throughout the hearing, appellant vacillated about whether she would willingly return to the hospital. First she said she would stay there, even though in her view they make her clean like a janitor, but that she would need food and good coffee. As the judge began to announce his determination of appellant's status, she interrupted to ask if she could go home to shower and wash her clothes before returning to the hospital. When the judge denied her request, appellant became agitated; asked her attorney to release her; said, "I was there for five days. It's enough, okay?"; and then told the court she wanted to go home, not back to the hospital.

Mohler made the following recommendation to the court:

"I think that [appellant] should return to the hospital for some further care. I'm concerned about her lack of insight and her poor judgment regarding her current mental status, as well as her refusal for routine blood work and medication while hospitalized. * * * She's now four months pregnant, refusing medical care, refusing prenatal care, refusing psychiatric care. She's obviously showing some unusual beliefs today. She's * * * overwhelmed by perfumes that I don't smell, and I don't know if anyone else smells here. She has some sleep disturbance and she's not being cooperative in the hospital. And I believe that these would continue if she were released and she would appear to me to be a danger to herself and unable to meet her basic needs."[3]

O'Malia's audible, nonhearsay recommendation was limited to the following:

"I feel that she has no insight as to the need for treatment and that's why she's continuing to refuse it. And * * * that this is clearly (audio not clear)."[4]

The two court examiners agreed with O'Malia that appellant suffers from bipolar disorder, manic phase. O'Malia's report concluded that appellant's "[j]udgment is severely impaired —problem solving is overly simplistic"; her "[i]mpulse control [is] impaired," as shown by her inability to sit during the hearing; and she shows "delusional thinking" about having to work like a janitor in the hospital and smelling odors in the courtroom. Mohler wrote in his report that appellant's condition is characterized by "delusional thinking," "poor judgment," and "no insight."

The court committed appellant on the "basic needs" ground:

"The Court then will rely on the findings and conclusions of the examiners which I will adopt and incorporate in making my final decision. * * * [T]he Court does find at this time that there's clear and convincing evidence that [appellant] suffers from a mental disorder and is unable to provide for

---

[3] Hearsay content omitted.

[4] Hearsay content omitted.

her basic personal needs, and will not receive any care necessary for her health or safety. * * * It is therefore ordered that [appellant] be committed[.]"

On appeal, appellant argues that the state did not carry its burden to show that she is a "mentally ill person." We agree with appellant. The elements to be proved and the burden of proof are statutory. ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A)   Dangerous to self or others.

"(B)   Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

ORS 426.130(1) provides, in part:

"After hearing all the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:

"(a)   Not mentally ill, the person shall be discharged forthwith.

"(b)   Mentally ill based upon clear and convincing evidence, the court:

"* * * * *

"(C)   May order commitment of the individual to the Department of Human Services for treatment[.]"

Thus, a court-ordered commitment requires proof to a clear and convincing standard, ORS 426.130(1)(b), that appellant is "mentally ill," meaning that (1) she has a mental disorder; (2) she is dangerous to self or others, or is unable to provide for her basic personal needs and is not receiving necessary care for health or safety; and (3) the mental disorder is a cause of her dangerousness or of her inability to provide or receive care to meet basic personal needs, ORS 426.005(1)(d)(A), (B). Because we review the record supporting a commitment order *de novo*, the particular ground on which the court committed the appellant does not limit our review. *See State v. Turel,* 182 Or App 235, 241, 48 P3d 175

(2002) (addressing "danger to self" where trial court ordered commitment on "basic needs" criterion).

The state contends that the evidence clearly and convincingly establishes that appellant is a "mentally ill person" by reason of "danger to self." The state argues that its burden is met by the accumulation of evidence, including the precommitment investigator's conclusions; the court examiners' reports and testimony; evidence of appellant's prior self-harm; her refusal to accept treatment; her lack of insight into her mental disorder and need for treatment; and her delusional, disordered thought processes.[5]

We first consider the "basic needs" ground on which the trial court relied. We have previously explicated the "basic needs" commitment standard:

> "The legislature's 'basic needs' commitment standard focuses on the capacity of the individual to survive, either through his own resources or with the help of family or friends. The state must establish by clear and convincing evidence that the individual, due to a mental disorder, is unable to obtain some commodity (e.g., food and water) or service (e.g., life-saving medical care) *without which he cannot sustain life*. The statute does not express a standard by which the imminence of the threat to life must be measured.

> "A speculative threat, such as the failure to take medicine under the circumstances in *State v. Brungard*[, 101 Or App 67, 71, 789 P2d 683, *modified on recons*, 102 Or App 509, 794 P2d 1257 (1990), *rev den*, 311 Or 427 (1991)], is not by itself sufficient. However, the state need not postpone action until the individual is on the brink of death. The goal of the commitment statute is safe survival, not merely the avoidance of immediate death."

---

[5] The investigator's and examiners' conclusory statements about prior self-harm based on hearsay are not available for us to consider on this record. The state correctly points out that examiners may rely on hearsay of a type reasonably relied on by experts in the field to form opinions on the subject, *see* ORS 40.415. Nonetheless, the factual record must support the examiners' opinions. "[I]n reviewing the record, we require examiners to fully explain the facts and observations that led them to a particular conclusion." *State v. Johnson*, 131 Or App 561, 564, 886 P2d 42 (1994).

*State v. Bunting,* 112 Or App 143, 145, 826 P2d 1060 (1992) (emphasis added). To meet the standard of an imminent threat to health and safety, the state must show that *"there is a likelihood that the person probably would not survive in the near future* because the person is unable to provide for basic personal needs." *Id.* at 146 (emphasis added). Furthermore, "[a] person's ability to care for herself is assessed in the light of existing, as opposed to future or potential, conditions." *State v. Headings,* 140 Or App 421, 426, 914 P2d 1129 (1996) (citing *State v. Stanley,* 117 Or App 327, 330, 843 P2d 1018 (1992)).

The standard of an imminent threat to "safe survival" is not met here. Appellant gave undisputed testimony that she had an apartment, a car, money and access to additional financial resources, and that she cared for herself by shopping and cooking. The medical providers involved with her care at the time of the hearing knew appellant had family members living nearby who monitor her and assist with her self-care. No one testified to an inability of the family to continue to assist appellant. No family, friends, or service providers testified to an inability of appellant to obtain commodities or services that are necessary to sustain her life. Inability to provide for "basic needs" requires "facts and observations that lead to such a conclusion." *Stanley,* 117 Or App at 330.

The evidence in the record addresses two aspects of appellant's current behavior and circumstances related to "basic needs" that might threaten her health, but do not imminently threaten her life: her refusal to accept psychiatric medication, and her alleged refusal to obtain prenatal care. The record clearly and convincingly shows by her own admission that appellant refuses medication to treat her mental disorder. However, the record does not show that appellant has progressive symptomatic deterioration because she is refusing medication, unlike the situation we considered in *State v. Jayne,* 174 Or App 74, 82, 23 P3d 990, *rev den,* 332 Or 316 (2001) (appellant was progressively deteriorating over course of a year). The available evidence covers only the short time period from August 2 to August 6. In that time, appellant's condition demonstrates consistent, not worsening, manic symptoms such as tense speech, intense

affect, lack of insight that she was thinking and behaving strangely, a single instance in her testimony of unusual sexual thinking, and tangential comments in response to internal stimuli. Appellant's delusional thinking as it is shown in the record—namely, a comment that nurses could substitute wine or beet juice for her blood and confused responses to some questions—does not support an inference that she could not care for herself in a way that was life-threatening with any degree of imminence.

As for appellant's alleged refusal of prenatal care, the record simply does not support that inference. Appellant denied that she had refused prenatal care. She consistently said, from the precommitment investigation forward, that she knew she was pregnant and wanted to have her baby. No evidence connects appellant's single blood draw refusal in less than a week of psychiatric hospitalization to prenatal care. We cannot say that two monthly appointments and a sonogram by the fourth month of pregnancy would be materially less than the recommended amount of prenatal medical services.

In fact, mere refusal to cooperate in her own psychiatric care and hospitalization are the predominant themes of the precommitment investigation and the court examiners' reports. Among many examples, appellant was "not cooperative with the interview," was "irritable," and "*all* comments were focused around getting out of the hospital immediately." (Emphasis added.) According to the precommitment report,

> "[s]he made repeated demands to be released. Insight and judgment were impaired and she clearly does not want to take medications. * * * She escalated when I told her I would not release her and * * * when I told her we would go to court and talk with the judge."

Mere rejection of psychiatric hospitalization, treatment for the mental disorder, and related judicial proceedings cannot be sufficient to establish failure to meet "basic needs." That line of reasoning would be hopelessly circular, imposing involuntary commitment on anyone who refuses to accept commitment and treatment. Understandably, the state and trial court are concerned about "future or potential conditions" of self-care if appellant experiences further mental

deterioration. But, as we have often stated, potential conditions do not meet a standard that represents "a likelihood that [appellant] probably would not survive in the near future." *Bunting*, 112 Or App at 146; *see also Headings*, 140 Or App at 426 (same); *Stanley*, 117 Or App at 330-31 (same).

■■■ We turn to whether appellant meets the requisite conditions for commitment based on "danger to self."

> "[T]he state must show that appellant's mental disorder has resulted in harm to herself * * * or created situations likely to result in harm. Although the danger to self standard does not require a threat of immediate harm, *consistent with the basic needs standard, the threat must exist in the near future.*"

*State v. Hambleton*, 202 Or App 526, 534, 123 P3d 370 (2005) (emphasis added) (internal quotation marks and citations omitted).

One unavoidable aspect of finding a "threat must exist in the near future" is that the person must show *current* indicators, symptoms, or behaviors that threaten harm or follow a similar pattern that led toward harm in the past. Essentially, this observation is closely related to the third element of the statute, that of causation: "Danger to self" must be caused by the person's present mental disorder to justify intervention to protect her from her own dangerous state. Without proof of the element of causation, we risk judging and committing individuals based solely on their history of mental health problems rather than to satisfy a current need for protection. It is worth restating here the rationale for the rigorous burden of proof in civil commitment matters. That standard is

> "not merely abstract or precatory. Rather, [it is] the product of a fundamental recognition of the priority of preserving personal liberties in civil commitment cases. The tension between the protection of personal liberties and the provision of medical help to persons with mental disorders can be relieved only if courts strictly adhere to the statutory requirements for involuntary commitment and ensure that there is an evidentiary basis that satisfies each of those requirements."

*Id.* (internal quotation marks and citations omitted).

Here, we first note that the cumulative evidence of appellant's refusal to accept treatment, lack of insight, and disordered thinking fails to support the "danger to self" criterion in the same way that it does not support "basic needs."

Second, we consider the evidence concerning past and potential self-harm, which are appellant's admissions that she made undefined suicide attempts in 1998 or earlier and that she threatened to harm herself during her current symptomatic episode. A person who has established a pattern of actions that lead to destructive behavior *and begins to follow that pattern again* can be found dangerous. *See State v. Lawrence*, 208 Or App 212, 216-17, 144 P3d 967 (2006) (danger to another); *State v. Roberts*, 183 Or App 520, 524, 52 P3d 1123 (2002) (danger to self). Here, the state failed to introduce sufficient facts of a past pattern or show that a pattern is beginning again.

Furthermore, "[p]ast verbal acts * * * must be supported by evidence that they clearly form a foundation for predicting future dangerousness." *State v. Jepson*, 48 Or App 411, 416, 617 P2d 284 (1980). Here, no evidence links anything about appellant's temperament or situation at the time of the possible prior acts of self-harm to her current condition. Beyond appellant's admission that she recently said she wanted to harm herself, there is no evidence by which to evaluate the seriousness and imminence of that threat. To the contrary, appellant testified that she did not currently have that thought or plan. The state introduced no evidence to contradict or discredit appellant's testimony. As with our recent conclusion in *Hambleton*, "concerns about potential harm to appellant, while understandable, are conjectural and speculative. Apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment." 202 Or App at 534-35 (internal quotation marks and citation omitted). Without speculating what evidence would be sufficient, we conclude here that the state failed to show to a clear and convincing standard that appellant's recent verbal threat, standing alone, represented an imminent danger to self.

Reversed.