Submitted March 8, reversed September 8, 2011

In the Matter of D. M.,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

D. M.,
*Appellant.*

Multnomah County Circuit Court
100160166; A144549

263 P3d 1086

Rebecca Carter filed the brief for appellant.

John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Christina M. Hutchins, Senior Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

In this civil commitment case, the trial court entered a judgment committing appellant to the Oregon Health Authority, pursuant to ORS 426.130(1)(b)(C), on the ground that appellant "suffer[ed] from a mental disorder" and was "[u]nable to provide for basic personal needs and [was] not receiving such care as [was] necessary for health or safety," ORS 426.005(1)(e)(B). Appellant seeks reversal of the judgment, arguing, *inter alia*, that the state failed to prove, by clear and convincing evidence, that he was unable to provide for his basic needs. We agree and, therefore, reverse.

Whether the state presented sufficient evidence to support a civil commitment is a question of law, which we review for errors of law. *State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010) ("[U]nless we exercise our discretion to review [a civil commitment] matter *de novo*,[1] we are bound by the trial court's findings of historical fact that are supported by any evidence in the record; we further review the court's dispositional conclusions, predicated on those findings, for errors of law.").

We begin with the facts, which we state consistently with the trial court's express and implied factual findings. *B. B.*, 240 Or App at 82. At appellant's commitment hearing on January 12, 2010, the state presented evidence of two encounters appellant had with police officers and health professionals. The first encounter occurred on December 20, 2009. On that date, police officers responded to a report that appellant was sleeping in a post office. The officers transported appellant from the post office to an apartment, where they believed he lived. Appellant was either unable or unwilling to enter the apartment. The officers called mental health professionals for assistance.

One of the two mental health professionals who responded, Daigneault, testified at the commitment hearing

---

[1] We have the discretion to review this case *de novo*, ORS 19.415(3)(b), and appellant has asked us to do so. Because we exercise our discretion to review *de novo* "only in exceptional cases," ORAP 5.40(8)(c), and because appellant has not identified any reason why this case is exceptional, as required by ORAP 5.40(8)(a), and we do not perceive one, we decline to review *de novo*. *State v. D. R.*, 239 Or App 576, 579, 244 P3d 916 (2010).

that, when she met with appellant outside the apartment, he was dressed appropriately for the December weather; he was wearing layers of clothing. But, according to Daigneault, appellant's hygiene was poor; he was "extremely malodorous." He was also "extremely unresponsive." He did not make eye contact or answer questions. His body was rigid, and Daigneault thought he might be exhibiting symptoms of early catatonia. Daigneault and her colleague had appellant transported to a hospital for an evaluation. Although the record is not entirely clear, it appears that appellant stayed in the hospital for about a week before being discharged.

The second encounter occurred on January 5, 2010. On that date, two police officers responding to a call went to a bar and found appellant seated in a booth with a man who was trying to keep him calm. The officers escorted appellant outside. According to one of the officers, Fleming, who testified at the commitment hearing, appellant was disheveled and his clothing was wet "all the way through." Fleming testified that it was cold out, but not freezing. Fleming had difficulty communicating with appellant. When asked, appellant told Fleming his name, but did not answer Fleming's other questions. Appellant identified himself as God, said that he had supernatural powers, and threatened Fleming with "double damnation." Appellant's body was rigid, but he allowed the officers to physically direct him. The officers transported appellant to a hospital. At the hospital, appellant was verbally aggressive. He again declared that he was God, and he threatened hospital staff members with damnation. He did, however, comply with their requests.

Two mental health examiners participated in the commitment hearing and wrote reports for the trial court. Both examiners reported that they believed appellant suffered from paranoid schizophrenia. One examiner believed that appellant was unable to provide for his basic needs and recommended commitment. The other believed that appellant was able to provide for his basic needs and recommended discharge.

The trial court was concerned that appellant had not been caring for himself, as established by the evidence that he had been malodorous, disheveled, and wet. The court

believed that, if appellant was released and the weather became cold, appellant would be at risk. The court explained:

> "I don't believe [appellant] is going to perish when he walks out the door here today, because it is not cold enough, not wet enough yet that he would die of hypothermia, because he would disregard his need to provide for his body—care for his body. He simply didn't care for his body both when [the mental health professionals from] Project Respond saw him and also when the officers saw him, his body was not cared for. And it would quickly deteriorate to the point where he would be wet once the weather changes, and it could even be this evening. If there are sub-zero temperatures, I don't think [appellant] has the ability to find someplace warm and dry to stay and to take care of his basic personal needs. And he would not be able to safely survive in the community for very long."

The trial court entered a judgment, concluding that appellant "suffer[ed] from a mental disorder," "[was] unable to provide for basic personal needs and [was] not receiving such care as [was] necessary for health or safety," and "[was] unwilling, unable or unlikely to participate in treatment on a voluntary basis," and committing appellant to the Oregon Health Authority for a period not to exceed 180 days.

On appeal, appellant makes two assignments of error. First, he assigns error to the trial court's conclusion that the state proved, by clear and convincing evidence, that he was unable to provide for his basic needs. ORS 426.130(1)(b)(C); ORS 426.005(1)(e)(B). Second, he assigns error to the trial court's conclusion that he had failed to prove that he was willing, able, and likely to participate in treatment on a voluntary basis. ORS 426.130(1)(b)(A). For the reasons explained below, we agree with appellant's first assignment of error and, therefore, do not reach his second.

In order to civilly commit a person, the state must prove, by clear and convincing evidence, that the person is mentally ill. ORS 426.130(1)(b)(C). The clear and convincing standard of proof is a rigorous one. *State v. M. R.*, 225 Or App 569, 574, 202 P3d 221 (2009). It requires evidence that is of " 'extraordinary persuasiveness.' " *State v. Hambleton*, 202 Or App 526, 533, 123 P3d 370 (2005) (quoting *State v. Howell*, 53 Or App 611, 617, 633 P2d 14 (1981)). It applies in civil

commitment hearings in order to protect the strong personal and liberty interests at stake. *Id.* at 534. In other words, the standard is "not merely abstract or precatory. Rather, [it is] the product of a fundamental recognition of 'the priority of preserving personal liberties in [civil commitment] cases.'" *Id.* (quoting *State v. Lott*, 202 Or App 329, 354, 122 P3d 97 (2005), *rev den*, 340 Or 308 (2006) (Edmonds, P. J., dissenting)) (second brackets in *Hambleton*).

"Basic needs are the things necessary for survival." *State v. Shorett*, 194 Or App 587, 595, 95 P3d 1146 (2004). They include the needs for water, food, and life-saving medical care. *State v. A. M.-M.*, 236 Or App 598, 603, 238 P3d 407 (2010). In order to commit a person on the ground that the person is unable to provide for his or her basic needs, the state must prove, by clear and convincing evidence, that, because of a mental disorder, the person is unable to secure basic self-care, and, as a result, the person "probably would not survive in the near future." *State v. Bunting*, 112 Or App 143, 146, 826 P2d 1060 (1992).

A person's ability to provide for his or her basic needs is assessed at the time of the commitment hearing " 'in the light of existing, as opposed to future or potential, conditions.' " *State v. C. A. J.*, 230 Or App 224, 231 n 5, 213 P3d 1279 (2009) (quoting *State v. Headings*, 140 Or App 421, 426, 914 P2d 1129 (1996)). A "basic needs" commitment must be based on "more than evidence of speculative threats to safe survival." *A. M.-M.*, 236 Or App at 605 (internal quotation marks omitted).

Because a basic needs commitment must be based on a current threat to a person's safe survival, we have held that evidence of homelessness is not, in and of itself, sufficient to support a basic needs commitment, nor is evidence that a person has schizophrenia and has suffered discomfort or minor injuries as a result of delusions. *State v. Baxter*, 138 Or App 94, 906 P2d 849 (1995), is illustrative.

In *Baxter*, the state presented evidence that the appellant, who had schizophrenia, had failed to take his prescribed psychiatric medications and, as a result, had difficulty sleeping, engaged in hostile behaviors, and abused drugs and alcohol. In addition to the state's evidence, the

appellant himself reported that, while homeless, he had sought medical care for dehydration and a hernia. The trial court committed the appellant on the ground that he was unable to provide for his basic needs. On *de novo* review, we reversed. 138 Or App at 99. We held that the appellant's failure to take his medications could not serve as a basis for his commitment because—even assuming that his failure to take his medications resulted in the behaviors that preceded his commitment, including sleeplessness, hostility, and substance abuse—the state had failed to prove that those behaviors were "so severe as to constitute a threat to his survival." *Id.* at 98. Similarly, we held that neither the appellant's homelessness, nor the physical ailments he had while homeless, could serve as a basis for his commitment, explaining that "we cannot say that homelessness by itself is sufficient grounds for commitment" and that the state had "failed to show that the ailments were so severe as to threaten appellant's survival." *Id.* at 99.

We recently followed *Baxter* in *A. M.-M.*, 236 Or App 598, in which the appellant, who had schizophrenia, refused to take his prescribed psychiatric medications and, as a result, experienced delusions that caused him to wage "a religious battle" in his grandmother's house, where he lived. *Id.* at 601. The appellant caused substantial damage to his belongings and bedroom, and he sustained minor cuts to his hands when he tried to "push[ ] glass through a wall." *Id.* Because of the appellant's destructive behavior, his grandmother was not willing to allow him to continue to live at her house. The trial court committed the appellant on the ground that he was unable to provide for his basic needs. On *de novo* review, we reversed, concluding that the "[a]ppellant's failure to take his prescribed medication caused a change in his behavior, but that behavior was not so severe as to cause a threat to his survival," and specifically noting that "[t]he minor cuts that appellant inflicted on himself while pushing glass through walls were not life threatening." *Id.* at 604. In addition, we held that, "[a]lthough it seems plausible that appellant will not have housing services available on release, as we said in *Baxter*, homelessness is not adequate justification for involuntary commitment." *Id.*

As mentioned, in both *Baxter* and *A. M.-M.*, we reviewed the trial courts' judgments *de novo*. "Nevertheless,

our disposition in each instance ultimately derived from legal principles that apply and control regardless of the standard of appellate review pertaining to the predicate facts." *B. B.*, 240 Or App at 84. As *Baxter* and *A. M.-M.* illustrate, the controlling legal principle is that, in order for a trial court to commit a person on the ground that the person is unable to provide for his or her basic needs, the state must present evidence that the person's mental disorder creates an imminent and serious threat to the person's health and safety. In other words, the state must establish the existence of a non-speculative threat to the person's near-term survival. Evidence that the person suffers from a mental disorder that impairs his or her judgment and has caused discomfort or minor injury is legally insufficient to support a basic needs commitment. Again, as we held in *Bunting*, the state must present evidence that, as a result of a mental disorder, the person "probably would not survive in the near future." 112 Or App at 146.

In this case, appellant does not dispute that, at the time of the commitment hearing, he suffered from a mental disorder. He does, however, dispute that he was unable to provide for his basic needs. As described, the trial court concluded that appellant was unable to provide for his basic needs because, in the court's view, appellant would be unable to protect himself from life-threatening hypothermia if the weather became colder. But, the record does not support the court's conclusion because there was no evidence that appellant had suffered, or was at risk of suffering, any life-threatening harm.

Appellant may have been homeless or at risk of being homeless. The evidence regarding his housing was unclear; the trial court stated that it could not tell whether appellant continued to live in the apartment he had lived in before. But, even assuming appellant was homeless, his homelessness could not serve as a basis for his commitment because there was no evidence that, because of his homelessness, appellant probably would not survive in the near future. As described above, the state presented evidence of appellant's circumstances and behavior on two occasions. On the first occasion, appellant had been sleeping in a post office and, according to the state's own witness, was dressed appropriately for the December weather. His clothes smelled, but

they were layered, and there was no evidence that they were wet or that appellant was cold. On the second occasion, appellant was inside a bar; his clothes were wet, but, again, there was no evidence that appellant was cold. There was no evidence that he was shivering, much less showing signs of any degree of hypothermia.

In that respect, this case is similar to *Hambleton*, 202 Or App 526, in which we reversed the commitment of the appellant, who, apparently acting in response to delusions, swam across a canal in 40-degree weather wearing little or no clothing and then sat, soaking wet, in a stranger's truck. When later interviewed by a police officer, the appellant was guarded and, at times, nonresponsive. The trial court committed the appellant on the ground that she was dangerous to herself, ORS 426.130(1)(a)(C), ORS 426.005(1)(e), which—like a basic needs commitment—requires "a 'particularized' and 'highly probable' threat to [a person's] safe survival, including a risk of substantial harm, in the near future." *B. B.*, 240 Or App at 84 (internal citations omitted). We reversed, noting that there was "no evidence that [the appellant] would be likely to suffer any harm, specifically including hypothermia, if she were to engage in such conduct in the future," and concluding, that "on this record, concerns about potential harm * * *, while understandable, are conjectural and speculative." *Hambleton*, 202 Or App at 534.

*State v. Webb*, 186 Or App 404, 63 P3d 1258 (2003), is similar. In *Webb*, the state presented evidence that the appellant, who had bipolar disorder and advocated for a "truly clothing-optional world," rode her bicycle in the nude in near-freezing weather, and the trial court committed her on the ground that she was a danger to herself. We reversed, noting that, "[a]lthough the law does not require that a threat of harm be immediate, it does require that the threat be real and exist in the near future," and concluding that, although "[t]here certainly is a possibility of harm in riding around nude in the cold[,] * * * no more has been shown than that mere possibility." *Id.* at 409; *see also State v. F. C.*, 239 Or App 83, 87-88, 243 P3d 144 (2010) (evidence that appellant had suffered an unspecified degree of hypothermia after lying on the ground in the freezing rain for an extended period of time was insufficient to support commitment on the

ground that appellant was a danger to herself where, after lying on the ground, appellant sought assistance).

In this case, the trial court concluded that appellant could not provide for his basic needs because he could not protect himself from wet and cold weather. The record does not support the court's conclusion for two reasons. First, there was no evidence that the weather was going to become life-threateningly cold in the near future. The court stated that, although the weather was not life threatening at the time of the hearing, it could become so, perhaps as soon as that night. But, there was no evidence in the record to support that statement; there was no evidence about the coming weather.[2] Second, even assuming that the weather was going to become life-threateningly cold, there was no evidence that appellant would not seek shelter. Indeed, the only relevant evidence demonstrated that he had sought shelter in the past, first at the post office, then at the bar. As in *Webb*, "there certainly is a possibility of harm" from exposure to the elements, but all that the record shows is "that mere possibility." 186 Or App at 409. It does not establish, as required for a basic needs commitment, that appellant "probably would not survive in the near future." *Bunting*, 112 Or App at 146.

In sum, although the trial court was understandably concerned about appellant's possible exposure to the elements, the evidence presented was legally insufficient to establish that defendant was unable to provide for his basic needs.

Reversed.

---

[2] The only statement about the coming weather, besides the court's, occurred when one of the examiners asked appellant what he would do if the weather became cold. Appellant said that he would go to a warming shelter, and the examiner replied, "Well, I don't know if any warming shelters are open today, because it is not terribly cold, fortunately."