Argued and submitted January 25, reversed May 30, 2007

In the Matter of L. P.,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

L. P.,
*Appellant.*

Umatilla County Circuit Court
MC050040; A129724

160 P3d 634

Janie M. Burcart argued the cause and filed the brief for appellant.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Sercombe,* Judges.

SERCOMBE, J.

---

* Sercombe, J., *vice* Deits, J. pro tempore.

**SERCOMBE, J.**

Appellant appeals a judgment committing her to the Department of Human Services, Mental Health Division, under ORS 426.130. Appellant contends that the court erred in finding that she was afflicted with a mental disorder at the time of the commitment hearing and that the disorder caused her to be a danger to herself. On *de novo* review, *State v. R. H.*, 212 Or App 479, 481, 157 P3d 1286 (2007), we conclude that there was insufficient evidence that appellant posed a danger to herself and reverse.

■     ORS 426.130(1) authorizes an order of commitment if the court determines that a person is "[m]entally ill, based upon clear and convincing evidence" and is unlikely to willingly participate in treatment on a voluntary basis.[1] For this purpose, ORS 426.005(1)(d)(A) defines "mentally ill person," among other things, as "a person who, because of a mental disorder" is "[d]angerous to self or others."[2] The issues on appeal are whether the state proved by clear and convincing evidence that appellant had a mental disorder and whether that disorder caused her to be dangerous to herself.

The facts at the time of the commitment hearing are probative. *State v. North,* 189 Or App 518, 520, 76 P3d 685 (2003). Appellant was a 43-year-old woman with a history of

---

[1] ORS 426.130(1) provides:

"After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:

"(a) Not mentally ill, the person shall be discharged forthwith.

"(b) Mentally ill based upon clear and convincing evidence, the court:

"(A) Shall order the release of the individual and dismiss the case if:

"(i) The mentally ill person is willing and able to participate in treatment on a voluntary basis; and

"(ii) The court finds that the person will probably do so."

[2] ORS 426.005(1)(d) defines a mentally ill person as

"a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety.

"(C) A person who:

"(i) Is chronically mentally ill [and meets specified characteristics] * * *."

mental disorders and drug abuse. For a number of years during her childhood, appellant was sexually abused by an acquaintance of her mother. She continued to suffer effects from that sexual abuse, experiencing depression, recurring nightmares, and "flashbacks" about that abuse. Appellant was diagnosed as having post-traumatic stress disorder because of that history. Five years before the commitment hearing, appellant had been hospitalized for treatment of that disorder, but had ended her hospital treatment prematurely and against the recommendation of her doctors.

Appellant's drug abuse was extensive. For many years, she regularly smoked marijuana. During the six to eight years before the hearing, appellant habitually used Soma, a muscle relaxant, taking up to 40 tablets each day. That abuse led to three criminal charges of driving under the influence of intoxicants, suspension of her driving privileges, and a credit card fraud claim from purchasing Soma on the Internet. Appellant's excessive use of Soma grew more acute in the months before the commitment hearing.

Appellant became incapacitated by her addiction to Soma. She was not eating and lost 56 pounds in the three months prior to the hearing. Her drug use made her confused, frightened, and tearful. It impaired appellant's memory and inhibited ordinary conversation. Under the influence of some drug, she fell down frequently and was bruised.

Appellant had been suicidal in the past. She first began to contemplate suicide when she was 20 years old and since then had had "numerous past suicide attempts." Appellant was hospitalized in May 2004 for an overdose of prescription medication. That overdose may have been an attempted suicide. Appellant attempted suicide in early 2005 through an overdose of drugs.

The evidence is conflicting on the event that triggered the commitment process. Dr. Khaleeq, a physician who examined appellant at Eastern Oregon Psychiatric Center (EOPC), testified at the hearing. In his notice of mental illness emergency hospitalization and written admission history, Khaleeq concluded that appellant had overdosed in a suicide attempt on August 15, 2005. The report of the mental health examiner notes the same attempt.

On the other hand, appellant testified she did not attempt to commit suicide at that time. Appellant's friend, Lindley, testified that she did not believe that appellant attempted suicide. The mental health investigator's examination determined that appellant's most recent suicide attempt was some months earlier. Appellant had ingested between 30 and 40 Soma tablets that day, but that consumption may not have been for purposes of killing herself.

There is no dispute that appellant was contemplating suicide and called Lindley on August 15, 2005, to seek help. Appellant testified that the suicidal thoughts were prompted by her recent discovery that her molester had abused someone else. Appellant spent the night at Lindley's home, recovering from using Soma. The next day, appellant told Lindley that she was "having some bad thoughts again" and that "she needs help with her addiction." Appellant called a crisis center. Appellant, Lindley, and another friend went to the emergency room of the local hospital for treatment. The two friends then accompanied appellant to EOPC, where she was admitted voluntarily.

Appellant's condition improved during her hospitalization. The staff noted that she was "cooperative" and "pleasant" with staff and the other patients. Her appetite and ease of sleeping improved. By August 22, appellant concluded that she should be in a drug and alcohol rehabilitation program and that she was hospitalized "because I took too much Soma and I'm glad I didn't die." That same day, an attending physician concluded that the appellant "needs treatment readiness work," but was a "minimal short-term risk for completed suicide, but moderate chronic risk," and needed an "addictions oriented disposition."

The commitment hearing occurred on August 23. There was equivocal testimony at the commitment hearing on the nature of appellant's mental illness and whether she posed a risk to herself at that time. Khaleeq discussed his initial examination of appellant at EOPC, and his conclusion that she suffered from a post-traumatic stress disorder because of the flashbacks and nightmares. He testified,

"I think her problem is actually substance dependency, which is (inaudible), especially if she was taking barbiturates. Sonol does have a component of barbiturate, and is sometimes life-threatening situation. People when they're overdosing on Sonol, it can be a life-threatening situation, and that was my concern, so I placed her on some (inaudible) just to avoid any withdrawal problems."[3]

Based on his examination of appellant's past medical records, Khaleeq stated that he "had the impression that she was probably depressed at some point * * *." This examination by the state's attorney then followed:

"[STATE]:   How does the—she obviously has some substance abuse issues. How does that tie with the actual mental illness that we're dealing with here?

"[KHALEEQ]:   Sometimes when people suffer from a mood disorder, like depression, anxiety, or PTSD, they try to self-medicate and it's from alcohol or with different drugs to make themselves calm. So I was under the impression that she's been suffering from this trauma for awhile, so I think that's the only way she can fight to make herself feel better.

"[STATE]:   Now, if she were able to be in a situation, either inpatient or outpatient, where she's dealing with her substance abuse issues, is that alone going to be enough to mean that she's no longer a danger to herself?

"[KHALEEQ]:   Well, I think right now she's not a danger to herself, and she has a really good understanding. In fact, from day one, she told me that she knows there's a problem and she needs help for that.

"But, looking at her history, she left the hospital against medical advice twice in the past, and I have a feeling that she won't go for further treatment. So I'm not exactly sure if she's going to follow through this time.

"[STATE]:   You testified that she's not a danger to herself, in your opinion, at this moment. In your opinion, if she

---

[3] The repeated references to "Sonol" in Khaleeq's testimony presumably meant "Soma." Soma was the drug used by the appellant. Sonal is not a prescription medicine.

is to not be committed here today, if she's to leave the hospital, to a reasonable medical probability, will she deteriorate such that she is again a danger to herself?

"[KHALEEQ]: If she starts taking Sonol again and trying to overdose, as she was telling me that she takes 30 to 45 pills a day as a routine, so I'm not sure her judgment would stay the same as you see her today, and she may get into a difficult situation, plus her history when she left the hospital against medical advice twice makes me wonder if she can comply with the treatment this time."

When pressed on the point again, on the "degree of certainty" that appellant would become a danger to herself without commitment, Khaleeq stated that he "still [has] some doubts" as to whether she would obtain voluntary treatment. He later testified that appellant "probably" would be a danger to herself in the future, but that, if she obtained voluntary treatment, "I'm sure it will be okay."

Under questioning from appellant's counsel, Khaleeq responded:

"[COUNSEL]: Is there anything that she—is there any lifesaving, I guess, concern that—if we assume that she's a danger to herself under your assumption, that she couldn't get at a drug inpatient treatment?

"[KHALEEQ]: Well, I think she's willing to go to an inpatient drug treatment. If she continues that, then I have no problem with accepting that.

"[COUNSEL]: So the only reason, just to clarify, that you believe she's a danger to herself is that she—

"[KHALEEQ]: Her history.

"[COUNSEL]: —is her history, and in the future, she might start taking drugs again, which might induce this mood disorder, which might then induce the post-traumatic stress, which might then lead to a suicide attempt?

"[KHALEEQ]: Yes."

When asked whether appellant needed to be committed to effectively treat her post- traumatic stress disorder, Khaleeq testified that "her insight seems a little better, and I think she is willing to seek help voluntarily, and I think she should be okay * * *."

Khaleeq revealed that appellant had told him that she wanted to be committed "because she has a tendency not to follow through with treatment," but that she changed her mind after speaking with her attorney. The medical investigator testified that appellant "had specifically requested that we seek a commitment for her * * *. She asked us because she had said that she would probably walk if we did not go ahead and seek commitment."

There was evidence that appellant was disposed and able to seek drug addiction treatment outside the confines of a mental health hospital. Appellant was a member of a women's mental health support group with Lindley and others. Lindley stated that she would help appellant in attending a voluntary drug treatment center. For a number of weeks immediately prior to the commitment hearing, appellant attended counseling sessions at New Horizons treatment center. She regularly had been seeing a psychologist every other week for almost three years.

Lindley testified that "we've talked about [appellant's drug abuse when she was] sober, that she wants to get help and that she knows she needs it, and she knows of her addiction." Appellant testified that she wanted help in getting assistance with her drug abuse, that she wanted to do a voluntary drug inpatient treatment, and was prepared to "stay someplace long-term."

At the conclusion of the hearing, the court determined that appellant suffered from a mental illness and committed her to the Mental Health Division for a period not to exceed 180 days. Based on appellant's prior experience in ending two hospitalizations against doctors' orders, the court found that appellant was not willing and able to participate in treatment on a voluntary basis.

On appeal, appellant claims that the state failed to prove by clear and convincing evidence that she had a mental disorder and that the disorder caused her to be a danger to herself. We conclude that there was insufficient evidence that appellant's mental condition caused her to be a danger

to herself and do not decide whether the state met its burden on establishing her mental disorder.[4]

Under ORS 426.130(1)(d), the state has the burden to prove by "clear and convincing evidence" that appellant's mental disorder caused her to be either a danger to herself or others, or unable to care for her basic needs. That standard of proof requires evidence that is of "extraordinary persuasiveness" and that makes the fact at issue "highly probable." *State v. Allen,* 209 Or App 647, 652, 149 P3d 289 (2006); *State v. Hambleton,* 202 Or App 526, 533-34, 123 P3d 370 (2005).

In order to establish that appellant is a danger to herself, the state must show that her mental disorder has "resulted in harm to [her]self * * * or created situations likely to result in harm." *State v. Christofferson,* 47 Or App 1087, 1090, 615 P2d 1152 (1980). The likelihood of harm need not be immediate but "must exist in the near future." *State v. Jacobson,* 142 Or App 371, 377, 922 P2d 670 (1996). That proof cannot be speculative or conjectural. *See State v. Ayala,* 164 Or App 399, 404, 991 P2d 1100 (1999) ("Apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment.").

The expert opinion about the potential of future harm to appellant was equivocal. The treatment records of an attending physician stated that appellant was a "minimal short-term risk for completed suicide, but moderate chronic risk." Khaleeq, the state's chief witness, opined that appellant was not currently a danger to herself, but that he had "a feeling" that she would not attend future treatment sessions, so that he was "not exactly sure if she's going to follow through this time." When pressed for a "reasonable medical

---

[4] As noted earlier, ORS 426.005 defines a mentally ill person to be a person who is "[d]angerous to self or others" or "[u]nable to provide for basic personal needs and is not receiving such care as is necessary for health or safety," or who suffers from chronic mental illness under particular circumstances. In *State v. Puha,* 208 Or App 453, 460, 144 P3d 1044 (2006), we held that, "[b]ecause we review the record supporting a commitment order *de novo,* the particular ground on which the court committed the appellant does not limit our review." Here, the state did not introduce clear and convincing evidence that appellant was dangerous to others or that she was unable to provide for her basic personal needs and was receiving insufficient care.

probability" of appellant's potential deterioration, he stated that appellant's history "makes me wonder if she can comply with the treatment this time" and that he "still [had] some doubts." Nevertheless, Khaleeq ultimately opined that "she is willing to seek help voluntarily, and I think she should be okay * * *." The mental health examiner's report concluded only that, without hospitalization, appellant's "chance of success in completing alcohol & drug treatment will be reduced."

That evidence of danger to appellant is not extraordinarily persuasive. Khaleeq testified that appellant was not a risk to herself at the time of the hearing. Appellant stated she had no intention of hurting herself in the future. Khaleeq's "doubt" about appellant's fortitude in continuing treatment for drug abuse does not constitute clear and convincing evidence of appellant's danger to herself.

In light of the equivocal testimony about probable future harm, we cannot say that the state discharged its burden of proof to show likelihood of future harm by clear and convincing evidence. Given that conclusion, there is no need to resolve appellant's first assignment of error, that the state failed to show the existence of a mental disorder.

Reversed.