173 P.3d 1251 (2007)
216 Or. App. 432
In the Matter of N.A.P., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
N.A.P., Appellant.
060161220; A131291.
Court of Appeals of Oregon.
Argued and Submitted August 21, 2007.
Decided December 5, 2007.
*1252 Liza J. Langford, Portland, argued the cause and filed the brief for appellant.
Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Michael C. Livingston, Senior Assistant Attorney General, filed the brief for respondent.
Before SERCOMBE, Presiding Judge, and BREWER, Chief Judge, and CARSON, Senior Judge.
SERCOMBE, J.
Appellant appeals an order of involuntary civil commitment. In one of her assignments of error, appellant argues that there is insufficient evidence in the record to establish that she suffers from a mental disorder that renders her a danger to herself. ORS 426.005(1)(d)(A). On de novo review, State v. Hitt, 179 Or.App. 563, 565, 41 P.3d 434 (2002), we conclude that the court erred in finding clear and convincing evidence that appellant's mental disorder causes her to be a danger to herself. Because we reverse the trial court's order on that claim of error, we need not address appellant's other assignments of error.
The relevant facts are undisputed. At the time of her commitment hearing, appellant was 40 years old, unemployed, and living in her own subsidized apartment. She was involuntarily hospitalized after she sought medical attention for what she described as a "headache;" her testimony indicates that she became uncooperative with hospital staff, was placed in restraints, and asked hospital staff to kill her.
The precommitment investigation report stated that appellant complained that the interviewing doctor did not ask her "`organic' questions regarding how to resolve the issue of the computer in her head and [its] running of her life and/or trying to kill her." She stated that she had come to the hospital for help but that she had simply "experienced the same thing that always happens when I go. They don't believe me and they want to keep me and send me to a hearing."
Appellant told the doctor that she had been diagnosed with a psychiatric disorder in 1997 but that she was not "psychiatric." She also stated that she wanted the examiner to kill her because she could not "go on like this anymore."
The precommitment investigation report concluded that appellant

*1253 "does not believe she has a mental disorder and is quite adamant about not taking any medication. She is completely delusional about her situation and is unwilling to listen to the possibility of anything other than what she believes to be true. She is quite insistent on having someone in the medical community take her life (for her) because she `can't go on like this any longer.' She does not participate in voluntary treatment on any level and * * * outpatient commitment is not in her best interest at this time."
At the precommitment hearing, appellant was examined by Dr. O'Malia and by LaRowe. She testified that she heard voices, slept very little, and that her neighbors were "coughing" at her and disturbing her. She stated that she preferred not to take her medication because she wanted to "continue" her life. She also testified that the sadness and depression associated with her disorder had been going on for 15 years and that her life had been "really bad." She repeated that she had delusions and heard voices telling her things. Indeed, during the hearing, appellant was attending to those voices.
Appellant also testified that she did not want to "go on living" and that she had felt that way for five years. She admitted that she had requested that hospital staff kill her, but explained that she just wanted the attendants to take "a little heavier responsibility for her." When the examiner asked her if she had ever thought about hurting herself, she said that she would "have a hard time doing that." He then asked her whether she had been feeling increasingly desperate. Appellant answered yes, stating that she lived in fear in her current apartment and wanted to move. The examiner then stated that he was worried that, if she were discharged, she might feel overwhelmed and attempt to hurt herself. She agreed because she could not "control her anger or laughter. I can't control my emotions at all." She agreed that the condition was getting worse and that she felt a loss of control. Appellant also testified that she felt isolated and that she had missed appointments with her caseworker over the previous few months after her voices told her that it was unnecessary for her to check in or to take her medications.
Both mental health examiners concluded that appellant suffered from a mental disorder (paranoid schizophrenia) and that she was a "danger to self" and would not benefit from voluntary treatment; they recommended that she be committed. They noted appellant's testimony that she had hallucinations, admitted feeling depressed, had sleep and appetite problems, wished others would kill her, and had no support system.
The court ruled as follows:
"Well, [addressing appellant], you know, it seems to me that with this very, very difficult situation and things getting worse for you, maybe it's time to at least try something a little bit different and just see whether they can do some good for you in the hospital.
"It seems, under the circumstances, it's best for me, really, to rely on the findings of-conclusions of the examiners, which I'll do, and find that there is indeed clear and convincing evidence that [appellant] suffers from a mental disorder and is dangerous to herself. The Court further finds that [appellant] is either unwilling, unable, or unlikely to participate in treatment on a voluntary basis and that a conditional release is either unavailable or not in her best interest."
On appeal, appellant argues that the state did not discharge its burden of proving that she is a "mentally ill person." The relevant standards are set by statute. ORS 426.130(1) authorizes an order of commitment if the court determines that a person is "mentally ill, based on clear and convincing evidence," and is unlikely to willingly participate in treatment on a voluntary basis.[1] For *1254 this purpose, ORS 426.005(1)(d)(A) defines "mentally ill person," among other things, as "a person who, because of a mental disorder, is * * * [d]angerous to self or others."[2]
The "clear and convincing evidence" standard of proof requires evidence that is of "extraordinary persuasiveness," so that the fact at issue is "highly probable." State v. Allen, 209 Or.App. 647, 652, 149 P.3d 289 (2006); State v. Hambleton, 202 Or.App. 526, 533-34, 123 P.3d 370 (2005). The evidence cannot be speculative, State v. Ayala, 164 Or.App. 399, 404, 991 P.2d 1100 (1999), or equivocal, State v. L.P., 213 Or.App. 225, 234, 160 P.3d 634 (2007).
A court-ordered "dangerous to self" mental commitment requires clear and convincing evidence that a person has a "mental disorder." The state must then show causation-that current indicators, symptoms, or behaviors of that mental disorder show that the threatened harm is likely to occur or follow a similar pattern that led toward harm in the past. State v. Puha, 208 Or.App. 453, 464, 144 P.3d 1044 (2006). The condition of "dangerous to self" must be caused by the person's present mental disorder to justify intervention to protect her from her own dangerous state. Id. As we stated in Puha, "[w]ithout proof of the element of causation, we risk judging and committing individuals based solely on their history of mental health problems rather than to satisfy a current need for protection." Id. The causation standard is the
"product of fundamental recognition of the priority of preserving personal liberties in civil commitment cases. The tension between the protection of personal liberties and the provision of medical help to persons with mental disorders can be relieved only if courts strictly adhere to the statutory requirements for involuntary commitment and ensure that there is an evidentiary basis that satisfies each of those requirements."
Hambleton, 202 Or.App. at 534, 123 P.3d 370 (citation, internal quotation marks omitted).
Finally, although the threat of harm need not be immediate, it must be real and exist in the "near" future. State v. Olsen, 208 Or.App. 686, 691, 145 P.3d 350 (2006). Thus, whether the state's evidence at the hearing was sufficient to support commitment on the ground that appellant was a danger to herself turns on whether her mental disorder would cause her to engage in behavior that is likely to result in physical harm to herself in the near future.
On appeal, appellant does not challenge the finding that she suffers from a mental disorder of paranoid schizophrenia. Instead, she claims that her mental disorder does not cause her to engage in behavior that is likely to result in physical harm to herself. The state contends that a likelihood of harm is shown by appellant's expressed desire to not "go on living," her request that the hospital staff end her life, and her increasing desperation about her condition.
We have held that a stated desire to die is insufficient by itself to prove the condition of "dangerous to self" by clear and convincing evidence. In State v. Simon, 180 Or.App. 255, 257-58 42 P.3d 374 (2002), we reversed a trial court decision committing a woman who stated that she wanted to die but that she had not "attempted suicide lately." During her prehearing hospitalization, the woman had shouted, "God, take my life, I don't care anymore," expressed that the medication being offered to her was harmful, and asserted that people were practicing witchcraft against her. Id. However, she testified that she was not experiencing any suicidal feelings or desires to hurt others at the time of the hearing. Both examiners testified that the alleged mentally ill person in Simon was a danger to herself because of her mental disorder, unpredictable and impulsive behavior, and noncompliance with medication. We held that the allegedly mentally ill person's statements that she wished at times that she *1255 were dead did not rise to the level of clear and convincing evidence that she was likely to attempt to take her own life in the near future. We concluded that "[p]redicting human behavior is an inherently speculative endeavor" and, when the legislature imposed a clear and convincing evidence standard, it sought to ensure that involuntary commitment and "deprivation of liberty that accompanies it would not occur except when based on evidence of extraordinary persuasiveness." Id. at 263, 42 P.3d 374 (citing State v. Johnson, 131 Or.App. 561, 564, 886 P.2d 42 (1994)).
In Puha, we held that evidence that a person had attempted suicide years previously and had threatened to harm herself during her current symptomatic episode was not sufficient to prove the condition of danger to self. Beyond the admission by the alleged mentally ill person that she said that she wanted to harm herself, there was "no evidence by which to evaluate the seriousness and imminence of that threat." Given the testimony by the alleged mentally ill person that she did not currently have a plan to harm herself, we determined that her recent oral threat alone did not prove by clear and convincing evidence that she was an imminent danger to herself. Puha, 208 Or.App. at 465, 144 P.3d 1044.
Consistently with Simon and Puha, the facts of this case do not establish a threat of harm to self by evidence of extraordinary persuasiveness. Although delusional behavior may be inherently risky, that behavior is not enough to warrant involuntary commitment unless danger to self is highly probable in the near future; mere speculation is not enough. Although appellant did exhibit a sense of hopelessness and increased desperation about her delusions, and expressed a wish that hospital staff would end her life, it is speculative whether appellant would actually attempt to take her own life.
A statement that one "wishes others would kill her" is not the same as an assertion that one has formed the intent to harm oneself. When asked if she "ever thought about hurting herself," appellant stated that she "would have a hard time doing that." Although admitting that she requested staff to kill her, appellant testified that she just wanted the attendants to take "a little heavier responsibility" for her. In fact, appellant's decision to seek help by going to the hospital, when viewed with her statements at the hospital and in her precommitment interview that she wanted staff to kill her because she couldn't "go on like this anymore," suggest that she intended to communicate her desire that staff help relieve her symptoms.
Appellant has not attempted suicide in the past. She has lived with her mental illness for many years without self-inflicted harm.[3] In sum, clear and convincing evidence was lacking that appellant's paranoid schizophrenia would cause her to engage in behavior likely to result in physical harm to herself in the near future. Standing alone, a statement that one wants to die or wants staff to kill one, especially with no history of suicide attempts, is not tantamount to an assertion that one intends to inflict self-harm in the near future.
Reversed.
NOTES
[1] ORS 426.130(1) provides, in part:

"After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:
"(a) Not mentally ill, the person shall be discharged forthwith.
"(b) Mentally ill based upon clear and convincing evidence, the court:
"(A) Shall order the release of the individual and dismiss the case if:
"(i) The mentally ill person is willing and able to participate in treatment on a voluntary basis; and
"(ii) The court finds that the person will probably do so."
[2] ORS 426.005(1)(d) defines a "mentally ill person" as,

"a person who, because of a mental disorder, is one or more of the following:
"(A) Dangerous to self or others.
"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety.
"(C) A person who:
"(i) Is chronically mentally ill [and meets specified characteristics]."
[3] In Puha, we held that, "[b]ecause we review the record supporting a commitment order de novo, the particular ground on which the court committed the appellant does not limit our review." 208 Or.App. at 460, 144 P.3d 1044. Here, the evidence from the hearing also does not show that the appellant was dangerous to others or that she was unable to provide for her basic personal needs and was receiving insufficient care.