***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

Submitted September 28, affirmed December 7, 2022

In the Matter of J. J. L.,
a Youth.
STATE OF OREGON,
*Respondent,*

*v.*

J. J. L.,
*Appellant.*
Douglas County Circuit Court
15JU00769; A176313

Frances Elaine Burge, Judge.

Ginger Fitch and Youth, Rights & Justice filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Kirsten M. Naito, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

PER CURIAM

Affirmed. *State v. A. L. M.*, 305 Or App 389, 399, 469 P3d 244, *rev den*, 367 Or 218 (2020).

Egan, J., concurring.

**EGAN, J.,** concurring.

In 2015, when J was a 13-year-old child, he admitted that he had committed acts that, if he were an adult, would constitute second-degree rape under ORS 163.365—*viz.*, sexual contact with his then seven-year-old half-sister. I would be remiss if I did not acknowledge the devastating and lifelong effect that J's conduct had on his sister. My concurrence is not meant to diminish those effects. I write only to point out that both the victim and the perpetrator were children at the time of the offense and, as explained below, the issue decided by the juvenile court in this case concerns J's future.

Over the six years following J's admission, J engaged in sex-offender treatment, took responsibility for his conduct, matured, improved his self-control, and, most importantly, did not reoffend.

In 2020 and 2021, the juvenile court held hearings pursuant to ORS 163A.030 on the question of whether J—who was then aging out of the jurisdiction of the juvenile court and embarking upon adulthood—should be required to register as a sex offender pursuant to ORS 163A.025. At those hearings, J had the burden of proving "by clear and convincing evidence" that he was "rehabilitated and does not pose a threat to the safety of the public." ORS 163A.030(7)(b). That is, he had the burden of proving by *clear and convincing evidence* that, *in the future*, his conduct would not endanger the public. *State v. A. R. H.*, 314 Or App 672, 679, 499 P3d 851 (2021), *rev allowed*, 369 Or 504 (2022) (Aoyagi, J., concurring) (noting that the standard under ORS 163A.030 is "forward looking"); *State v. N. A. P.*, 216 Or App 432, 437, 173 P3d 1251 (2007) ("The clear and convincing evidence standard of proof requires evidence that is of extraordinary persuasiveness, so that the fact at issue is highly probable." (Internal quotations marks omitted.)).

Perhaps unsurprisingly, given that standard of proof, the juvenile court held that J—who was then two months shy of his 20th birthday—had not met his burden and ordered J to register as a sex offender pursuant to ORS 163A.025. That ruling subjected J to a multitude of reporting requirements; exposed J to criminal liability for

violating those reporting requirements; and, the weight of empirical studies suggests, did not make our communities any safer.

I must concur with the majority's disposition in this case, because the juvenile court judge correctly interpreted the burden of proof imposed by ORS 163A.030, and this court's standard of review dictates that we affirm. *A. R. H.*, 314 Or App at 678 ("[I]t will perhaps be rare that we reverse a juvenile court that has determined that a youth failed to meet the youth's burden under ORS 163A.030 (7)(b)."). I write because I am deeply troubled by the application of such a high standard of proof—coupled with our standard of review—to a person who offended at age 13, who has demonstrated adherence to his treatment plan, who has taken responsibility for his conduct, who has not reoffended, and who—the research indicates—is highly unlikely to offend in the future.

Rather than outlining the details of J's progress, the faith in his recovery and rehabilitation attested to by his treatment providers, or his turbulent childhood, this concurrence will simply explain the problem with the "clear and convincing" standard of proof (as coupled with the standard of review that that standard of proof requires on appellate review). I do so because the result in this case is not dictated by J's conduct after being adjudicated to be within the jurisdiction of the juvenile court or our interpretation of ORS 163A.030: It is dictated by the "clear and convincing" standard imposed by ORS 163A.030 itself.

## I.   THE MYTH

To understand the problem with application of the "clear and convincing" standard as applied to those who offended as juveniles, it is important to understand that our scheme for juvenile sex offender registration is based on a myth—*viz.*, that recidivism rates among sexual offenders are "frightening and high." *See McKune v. Lile*, 536 US 24, 33-34, 122 S Ct 2017, 153 L Ed 2d 47 (2002) (characterizing recidivism rates among sexual offenders as "frightening and high"). Decades of research have shown that, particularly with regard to juvenile offenders, recidivism rates are anything but high. *See, e.g.*, Michel F. Caldwell, *Quantifying*

*the Decline in Juvenile Sexual Recidivism Rates,* 22 Psychol Pub Pol'y & L 414, 416-17 (2016) (studies on juvenile reoffending conducted from 2001 to 2015 reported an average sexual recidivism rate of just 2.75 percent over five years, most occurring within the first two to three years); *see also* Michael F. Caldwell & Brendan M. Caldwell, *The Age of Redemption for Adolescents Who Were Adjudicated for Sexual Misconduct*, 28 Psychol Pub Pol'y & L 167 (2022) (demonstrating the risk of a future sexual-offense charge for sexoffense adjudicated youth declined rapidly with age, to a level that was not significantly higher than youth adjudicated for nonsexual offenses by age 18). Further, research demonstrates that youth adjudicated for sexual offenses respond well to treatment. *See, e.g.*, Lorraine R. Reitzel & Joyce L. Carbonell, *The Effectiveness of Sexual Offender Treatment for Juveniles as Measured by Recidivism: A Meta-Analysis*, 18 Sexual Abuse 401 (2006) (a summary of nine studies on juvenile sexual offender treatment effectiveness indicated a statistically significant effect of treatment on sexual recidivism). And research shows that juveniles who sexually offend differ from their adult counterparts in important ways. *See, e.g.*, Elizabeth J. Letourneau & Michael H. Miner, *Juvenile Sex Offenders: A Case against the Legal and Clinical Status Quo*, 17 Sexual Abuse 293, 296-300 (2005) (available data does not support an assumption that juvenile sex offenders have more in common with adult sex offenders than with other types of juvenile offenders).

But the myth that, writ large, recidivism among those convicted of sex crimes is "frightening and high" has taken hold in our legal system. As highlighted by *New York Times* reporting, the United States Supreme Court continues to endorse that myth in its decision-making. *See* Adam Liptak, *Did the Supreme Court Base a Ruling on a Myth*, NY Times (Mar 6, 2017), https://www.nytimes.com/2017/03/06/us/politics/supreme-court-repeat-sex-offenders.html (accessed Oct 31, 2022). Equally troubling, over 100 lower court decisions have relied on the language regarding recidivism rates being "frightening and high" in *McKune*, and a subsequent Supreme Court case citing *McKune*, *Smith v. Doe*, 538 US 84, 103, 123 S Ct 1140, 155 L Ed 2d 164 (2003), many to justify the banishment of registered sex

offenders—including those who offended as juveniles—from some of the most basic aspects of day-to-day life. Even today, against the weight of decades of research, lawyers still cite the myth that Justice Kennedy offered as fact in *McKune* and *Smith*.

Of course, the myth is not just taken as fact by many courts. Popular media is awash with stories regarding sex offenders that, understandably, stir an emotional response in the public, but do not portray accurate information regarding recidivism rates for sex offenders. In September 2013, for example, The Oregonian published an inflammatory editorial indicating that registration of sex offenders in Oregon should be a "top Oregon priority" because, until it is, "it is not unreasonable to expect sex offenders from elsewhere [to move] to Oregon," with the "under-the-radar" offenders being "scariest of all," and further explaining that "[n]obody wants a dangerous creep living down the hall or across the street." Editorial Board, *Accounting for sex offenders should be a top Oregon priority*, The Oregonian (Oct 8, 2013), https://www.oregonlive.com/opinion/2013/10/accounting_for_sex_offenders_s.html (accessed Oct 31, 2022).[1] In 2017, broadcast media in Portland led with a story that "[t]housands of sex offenders" were "out of compliance" and that "Oregon now has the most sex offenders per capita in the U. S. according to the National Center for Missing and Exploited Children." *Thousands of sex offenders out of compliance, kept off public database in Oregon*, KATU 2 News Broadcast (Aug 1, 2016), https://katu.com/archive/thousands-of-sex-offenders-out-of-compliance-kept-off-public-database-in-oregon (accessed Oct 31, 2022). Such eye-catching news stories, and the narrations of particularly heinous sexual offenses that often accompany them, frequently do not take into account the wide variety of offenses that qualify for registration from state to state; they do not take into

---

[1] As discussed below, the research is clear sex offender registries—at least with regard to juveniles—do not decrease recidivism. Interestingly, while calling for sex offender registration to be a "top Oregon priority," the editorial in The Oregonian also noted that the Government Accountability Office wrote that "an overview of [studies of the impact of sex offender registries] 'found no clear effect on recidivism, for either sex offenses or other types of crime that sex offenders commit.'" Editorial Board, *Accounting for sex offenders should be a top Oregon priority*, The Oregonian (Oct 8, 2013).

account the varying periods of registration from state to state; they do not take into account the variations in registration of youths among the states; and they do not distinguish between those who offend as juveniles and those who offend as adults. Such news stories often perniciously serve to reinforce a false notion that a stranger—rather than someone known to the victim—is likely to be the perpetrator of a sexual assault. *See, e.g.*, Sarah W. Craun & Matthew T. Theriot, *Misperceptions of Sex Offender Perpetration*, 24 J of Interpersonal Violence 2057, 2057-58 (2009) (noting that misconception, as well as that, "[a]mong sexual abuse cases reported to law enforcement, less than 5 [percent] involved perpetrators who were characterized as strangers").

Nationally, our laws regarding sex offenders developed as a result of such lore thereby cloaking the myth in the legitimacy of both our legal system and our policy-making bodies: In the early 1990s, legislators around the country rushed to address the burgeoning phenomenon of widely reported sex crimes with the passage of laws named after specific children and based on anecdotal evidence. The United States Congress and state legislative assemblies passed laws named after victims of the worst, most highly publicized, and comparatively rare type of crimes against children, like "Megan's Law," the "Adam Walsh Child Protection and Safety Act," and the "Jacob Wetterling Crimes Against Children and Sexual Violent Offender Registration Act," the latter of which mandated that states maintain sex offender registries.

That is the backdrop against which Oregon's sexual offender reporting statutes (SORS) developed, though Oregon's SORS did not start that way.

## II.   OREGON'S SORS

Oregon's original SORS, enacted in 1989, were designed to track statistics on recidivism and aid law enforcement officials in tracking known sexual offenders. They were not intended to be punitive, and compliance was relatively straightforward: They applied to a limited number of particularly heinous, serious sex crimes—*viz.*, rape, sodomy, sexual penetration with a foreign object, sexual abuse, or any attempt to commit any of those crimes; registration

began upon the release of an offender on parole or when the court sentenced an offender to a term of probation; the registration requirement lasted for only five years; there were no criminal penalties for failure to register; registration was required only when the offender changed residences; and registration could be completed by mail.[2] Oregon's original SORS was organized in ORS chapter 181, which related to executive crime reporting functions.

At that time, the frequency and length of registration required by Oregon's SORS followed the data found in contemporaneous literature, which reflected relatively low recidivism.

Over the ensuing decades, however, following the national trend, Oregon's SORS shifted from their roots as statutes designed to track statistics on recidivism and aid law enforcement officials in tracking known sexual offenders, and became a punitive measure for offenders, both adult and juvenile.

More specifically, over the ensuing decades, Oregon's SORS adopted the inclusion of juveniles in the definition of "predatory sex offenders";[3] the length of time offenders, including juvenile offenders, were required to register under the SORS changed from a *maximum* of five years to a lifetime with the right to petition for relief after 10 years for sex offenses committed as a minor;[4] all failures to register became punishable as misdemeanors and felonies;[5] the time periods for registration shrunk from 30 days to 10 days;[6] and the list of crimes requiring registration expanded to include over 20 crimes (or attempt to commit those crimes), including "sexual abuse of an animal."[7] Finally, Oregon's SORS changed to comply with all-encompassing federal legislation.[8]

---

[2] Or Laws 1989, ch 984, §§ 1-3.

[3] Or Laws 1995, ch 422, §§ 62, 62a.

[4] Or Laws 1995, ch 422, § 63.

[5] Or Laws 1997, ch 538, § 6.

[6] Or Laws 1997, ch 538, §§ 3, 5.

[7] ORS 163A.005.

[8] 34 USC chapter 209 sets forth the current "comprehensive national system" for the registration of "sex offenders and offenders against children." 34

In addition to increasing the penalties for failure to register, since 1989, the legislature has increased the number of registration events. Presently, under ORS 163A.025, those who offended as juveniles and are on the sex offender registry must register by reporting in person "to the Department of State Police, a city police department or a county sheriff's office, in the county of the person's last reported residence" within 10 days of a change of residence; within 10 days of a legal change of name; once each year within 10 days of the person's birth date; within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; within 10 days of a change in work, vocation or attendance status at an institution of higher education; and at least 21 days prior to any intended travel outside of the United States.[9]

As the number of registration events under Oregon's SORS increased, the chances of successful compliance with Oregon's SORS decreased, and the risk of failure to register (and suffering concomitant criminal penalties) increased. Further, registration is now supervised by the Department of State Police.[10]

In 2015, the legislature renumbered Oregon's SORS and moved them from ORS chapter 181 to the criminal statutes in ORS chapter 163A. Twenty-five years after its inception, lawmakers finally and officially designated Oregon's SORS as a punitive law.

The operation of ORS chapter ORS 163A clearly illustrates the punitive nature of Oregon's SORS. Under that chapter, *all* children adjudicated as juveniles or prosecuted as adults under ORS 137.707 (Measure 11) for sex offenses are required to register for their lifetime, unless they qualify for special relief from the juvenile court or otherwise

---

USC § 20901. Under 34 USC section 20927(a), any jurisdiction that fails "to substantially implement" the requirements of the federal Sex Offender Registration and Notification Act "shall not receive 10 percent of the funds that would otherwise be allocated for that fiscal year to the jurisdiction" under the Edward Byrne Memorial Justice Assistance Grant Program. Thus, the federal government has provided a financial incentive for states to implement SORS, in effect, monetizing them.

[9]  ORS 163A.025(3).

[10]  ORS 163A.045.

qualify for relief as adults. Whether under Measure 11 or under the jurisdiction of the juvenile courts, those children are under the same punitive measure of misdemeanor and felony convictions if they fail to register or fail to meet one of the intricate arrays of registration requirements. Yet, under Oregon law, the purpose of Oregon's SORS "is to assist law enforcement agencies in preventing future sex offenses." ORS 163A.045. The only logical conclusion to be drawn is that the recidivism rate for sex offenders is so "frightening and high" that the only real solution is to lock people up who have committed sexual offenses in the past—whether they were children at the time or not—for status violations. But, as discussed above, that logic is premised on a myth.

### III.   THE PROBLEM WITH THE PUNITIVE APPROACH

The problem with the punitive approach taken by Oregon's SORS, at least with regard to juveniles, is both that it does not make our communities safer and does harm to adjudicated youth.

### A.   *Community Safety*

With regard to community safety, Professor Elizabeth J. Letourneau—now director of the Moore Center for the Prevention of Child Sexual Abuse at Johns Hopkins University—succinctly stated before Oregon's House and Senate Judiciary Committees on September 18, 2013, that, "Registration of juveniles fails, in any way, to improve public safety." *See* Meeting Materials, House and Senate Interim Committees on Judiciary, Sept 18, 2013 (Affidavit of Elizabeth J. Letourneau, Ph.D., Associate Professor, Department of Mental Health Director, Moore Center for the Prevention of Child Sexual Abuse at Johns Hopkins University).

That broad and sweeping statement is supported by the vast majority of available peer-reviewed research. *Id.* (noting "strong and empirically rigorous evidence" supports that statement). Indeed, Professor Letourneau and her colleagues—after completing six thorough statistical surveys in as many states—found *no deterrent* effect based on juvenile SORS. Further, in one study involving South Carolina's

SORS, she found that implementation of SORS influenced prosecution and conviction rates for sexual offenses in "unexpected ways":

> "In particular, results indicated a significant decline in the likelihood of prosecutors moving forward on juvenile sex crime cases after the implementation of [SORS]. When cases did move forward, there was a significant increase in the odds of pleading from a sex to a non-sex crime; thus, community safety could in fact be compromised as a result of reduced likelihood of prosecution for juvenile sex crimes."

*See* Meeting Materials, House and Senate Interim Committees on Judiciary, Sept 18, 2013 (Elizabeth J. Letourneau, *Does Sex Offender Registration and Notification Work with Juveniles?*, 4 (2009)). The results of that study led Professor Letourneau and her colleagues to hypothesize that prosecutors were "reluctant to subject some juveniles who sexually offended to South Carolina's lifetime registration and public notification requirements and, instead, selectively forwarded more serious cases after the implementation of [SORS]." *Id*. at 3.

In my view, the phenomenon of pleading to non-sex crimes is just as easily explained by the prosecutorial construct of "over-charging" a defendant with an offense with a long mandatory sentence and then pleading down to a harsh but more flexible sentence. This construct has a name: "Leveraging."[11] The most common form of leveraging in Oregon occurs when prosecutors use "leverage" to negotiate from a determinate Measure 11 sentence to an indeterminate sentence of like length. A study of this construct in Oregon showed that prosecutors use "leveraging" in 70 percent of serious criminal cases. Criminal Justice Commission, State of Oregon, *Longitudinal Study of the Application of Measure 11 and Mandatory Minimums in Oregon*, ix (Mar 2011). Perhaps as a result of leveraging, in Oregon, the number of convictions for sexual offenses subject to Measure 11 has declined in the last 15 years, but the

---

[11] *See* Richard A. Oppel, Jr., *Sentencing Shift Gives New Leverage to Prosecutors*, NY Times (Sept 25, 2011), https://www.nytimes.com/2011/09/26/us/tough-sentences-help-prosecutors-push-for-plea-bargains.html (accessed Oct 31, 2022).

number of months served for those offenses by adults and juveniles has increased by over 150 percent. *Id.* at 58.

Whether the unintended consequences of SORS are the failure to prosecute sexual offenders or overcharging and leveraging a potential lifetime of registration requirements, both consequences illustrate the failure of the law to meet its nascent goals of preventing future sex offenses and controlling recidivism. In that regard, I note that a 2009 study found that approximately 95 percent of sexual offenders arrested for sexual offenses had *no prior* convictions for sexual offenses and, therefore, the vast majority of offenders did not appear on the SORS lists prior to their offense. Jeffrey C. Sandler, Naomi J. Freeman & Kelly M. Socia, *Does A Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law*, 14 Psychol, Pub Pol'y & Law 284 (2008). Those findings cast serious doubt on the efficacy of SORS in targeting repeat offenders or meaningfully reducing sexual violence. *Id.*

B.   *Harm to Adjudicated Youth*

In addition to failing to make our communities safer, juvenile SORS do real harm to adjudicated youth. As Professor Letourneau explained to the Oregon Legislature:

> "The process of identifying oneself as a registered sex offender multiple times per year, and of being arrested and possibly charged for new offenses due in part to this label seems likely to cause registered youth to view themselves as 'delinquent' even when they are law-abiding. Ample evidence indicates that youth who view themselves as delinquent or outside the mainstream are less likely to change patterns of offending. Policies that promote youths' concepts of themselves as lifetime sex offenders will likely interrupt the development of a positive self-identity."

Meeting Materials, House and Senate Interim Committees on Judiciary, Sept 18, 2013 (Affidavit of Elizabeth J. Letourneau, Ph.D., Associate Professor, Department of Mental Health Director, Moore Center for the Prevention of Child Sexual Abuse at Johns Hopkins University).

Professor Letourneau's observation is supported by an overwhelming amount of research: Studies have repeatedly

shown that criminal prosecutions, sentences, incarcerations, and stigmatization through punitive measures like SORS lead to criminal labeling of youths and do not reform young people. *See, e.g.*, Patricia Allard & Malcolm Young, *Prosecuting Juveniles in Adult Court: Perspectives for Policymakers and Practitioners*, The Sentencing Project, 7 (2002) ("Although youths transferred to the adult criminal justice system are more likely to be convicted and incarcerated, they are more likely to re-offend, re-offend earlier, and to commit more serious subsequent offenses than those who remain in the juvenile system."); *see also* Jeffrey Fagan, *The Comparative Advantage of Juvenile Versus Criminal Court Sanctions on Recidivism among Adolescent Felony Offenders*, 18 Law & Pol'y 77, 77 (1996) ("[R]ecidivism rates were significantly lower for adolescents sentenced in the juvenile court, regardless of sentence type or severity. The results suggest that efforts to criminalize adolescent offending may not produce the desired results and may in fact be counterproductive."). Simply put, adult sanctions are inappropriate for children and do not reduce recidivism.

Author Nell Bernstein summarized the last few decades of decline in the administration of juvenile justice and the aftermath:

> "The mass criminalization of teenagers, taking place of decades of demographic transformation that have given us the most diverse generation this country has known, has cleared the way for the legal and literal segregation of a group of young people—the overwhelmingly poor black and brown children with whom we fill our juvenile prisons—who are indelibly marked as 'other' by the experience: their names exchanged for prison ID numbers, their clothing replaced by uniforms marking them property of the state, their resumes forever tarnished by their records, every aspect of their futures constrained by the errors of their youth."

Nell Bernstein, *Against Reform: Beyond the Juvenile Prison*, in *Burning Down the House: The End of Juvenile Prison* 307, 310 (2016).

Bernstein's recitation of the marks of imprisoned youth and the stigma that they carry are equally applicable

to the marks and stigma applied to juvenile registrants under SORS.

## IV.    WHERE THE RUBBER MEETS THE ROAD

In my view, evidence on the effectiveness and need for SORS for those who offend as juveniles, coupled with new gains in the science of adolescent development, leads to the conclusion that legislators, policymakers, and practitioners should reconsider the appropriateness of the application of SORS to those who offended as juveniles. SORS, at least as applied to juvenile offenders, offer very little help in providing for public safety from juvenile delinquents and aggravate—rather than alleviate—the issues that they were designed to address.[12] Consequently, mitigation from their application is the best possible outcome for adjudicated youth. For that reason, application of the *clear and convincing* standard to a young person like J flies in the face of good outcomes for both adjudicated youth seeking to reform themselves and the larger community.

But if that is the obvious conclusion based on the research—and I think it is—why does Oregon still require a person who offended as a 13-year-old, who has participated in treatment, and who has not reoffended, like J, prove "by clear and convincing evidence" that he is "rehabilitated and does not pose a threat to the safety of the public" to avoid the stigma of sex offender registration as an adult? I believe that the answer to that question is that the public's belief in "the myth" has caused legislators to adopt an approach of caution and slow marginal change even in the face of overwhelming data.[13]

---

[12] The Supreme Court of Canada recently drew those same conclusions about application of certain SORS against adults and concluded that those SORS were "overbroad" in their application, requiring that those SORS be invalidated. *R. v. Ndhlovu*, 2022 SCC 38 (Can).

[13] For example, former Representative Wally Hicks, a Republican from Grants Pass who sat on the Joint House and Senate Committee on Public Safety, when faced with a proposal to scale back the scope of Measure 11, explained that he did not think the "undoing of Measure 11 is going to happen," but noted the legislature needed to figure out a way to both "cut costs and keep the public safe," because those are both "popular." Chris Conrad, *The High Cost of Measure 11*, Mail Tribune (May 5, 2013), https://www.mailtribune.com/archive/2013/05/05/the-high-cost-of-measure-11/ (accessed Oct 31, 2022).

    In *A. R. H.*, we recognized that "the burdens imposed on youths under ORS 163A.030, and our review of orders issued under ORS 163A.030, are a matter of legislative prerogative, and may be changed by legislative action." 314 Or App at 678. But courts have been responsible for helping to spread the myth of "frightening and high" recidivism among sex offenders, which has led us to where we are today. Therefore, it is important to say the following words that must be said from the bench: Oregon's scheme for sex offender reporting for those who offended as juveniles is a punitive measure, that does not make our communities safer, and has negative consequences which disproportionately effect Oregon's most at risk kids.